Kevin A. Darby (NVSB #7670)
Tricia M. Darby (NVSB #7956)
DARBY LAW PRACTICE, LTD.
4777 Caughlin Parkway
Reno, Nevada 89519
Phone: (775)322-1237
Facsimile: (775) 996-7290
kad@darbylawpractice.com
Attorney for Debtor

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

In re:

SHAUN DONALD RORY MCLEAN,

       Debtor.

/

Case No.: BK-N-18-51435-btb
Chapter 11

**DECLARATION OF SHAUN DONALD RORY MCLEAN IN SUPPORT OF MOTION: (1) TO SELL REAL PROPERTY FREE AND CLEAR OF LIENS (WITH CERTAIN EXISTING LIENS ATTACHING TO NET SALE PROCEEDS) PURSUANT TO 11 U.S.C. §363; AND (2) FOR ORDER DIRECTING THE TURNOVER OF NET SALE PROCEEDS PURSUANT TO 11 U.S.C. §542**

Hearing Date:   March 12, 2019
Hearing Time:  11:00 a.m.

SHAUN DONALD RORY MCLEAN, under penalty of perjury states as follows:

1.    On December 21, 2018, I filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code thereby commencing this bankruptcy case.

2.    As set forth in Schedule A to my bankruptcy petition, at the time this case was filed I owned real property located at 20 rue de Miromesnil, Paris, France 75008 (the "Miromesnil Property").

3.    The Miromesnil Property is encumbered by a first priority lien claim in favor of Baratte for past-due homeowners association dues

4.    Schedule D to my bankruptcy petition lists a disputed and unliquidated claim asserted by VP Bank in the amount of $3,704,952.02 (the "VP Bank Claim"). Prior to the Petition Date, on

March 23, 2018, VP Bank asserted a pre-judgment lien called a provisoirement une hypothèque (a provisional mortgage) against the Miromesnil Property (the "VP Bank Lien").  I assert a claim against VP Bank as well.

5.   On or about April 9, 2018, I accepted an offer from to BW GROUPE  ("BW") to sell the Miromesnil Property to BW for € 1,175,000.  Attached hereto as Exhibit 1 is a true and correct copy of the Promesse De Vente between BW and I (the "Purchase Agreement").

6.   I will be required to pay certain costs of sale, including escrow fees, taxes and syndic (HOA) fees (the "Costs of Sale"), estimated as follows:

| Payee | Amount | Description |
|-------|--------|-------------|
| Barattte | € 17,736 | Syndic (HOA fees) |
| tbd | € 732.40 | Escrow trustee fees |
| Paris/France | € 94,837.00 | Plus Value Tax (capital gains) |
| tbd | € 5,620.00 | SARF fees (tax representative) |
| Paris/France | € 9,000.00 | Frais de Mainlevée (transfer tax) |
| tbd | € 132,17 | Copies |

7.   After paying the above listed Costs of Sale, estimated at $144,390, the net sales proceeds are estimated to total $1,180,009.

DATED this 11th day of February, 2019.


/s/ Shaun Donald Rory McLean
_____
SHAUN DONALD RORY MCLEAN

**EXHIBIT 1**

**EXHIBIT 1**

100023301
SLM/CMO/

**L'AN DEUX MILLE DIX HUIT,**
    **LE NEUF AVRIL**
        **A PARIS (75017), 107, Rue de Courcelles, au siège de l'Office Notarial, ci-après nommé,**
        **Maître Florence LEVI, Notaire au sein d'un Office Notarial à PARIS 17ème, 107, Rue de Courcelles,**

        **Avec la participation de Maître Virginie FOUCAULT, notaire à PARIS (16ème), assistant le PROMETTANT.**

        **A RECU le présent acte contenant PROMESSE DE VENTE à la requête de :**

### PROMETTANT

Monsieur Shaun Donald Rory **MCLEAN**, sans profession, époux de Madame Dara Megan **BEADLE**, demeurant à MONACO (MONACO) 4 lacets Saint Léon.
Né à LONDRES (ROYAUME-UNI) le 24 janvier 1969.
Marié à la mairie de SAN MARCOS COMTÉ DE SAN DIEGO ETAT DE CALIFORNIE (ETATS-UNIS) le 20 janvier 2016 sous le régime de la communauté d'acquêts régime légal de l'état de Californie.
Ce régime matrimonial n'a pas fait l'objet de modification.
De nationalité Britanique.
Non résident au sens de la réglementation fiscale.

### BENEFICIAIRE

La Société dénommée **BW GROUPE**, Société à responsabilité limitée au capital de 1570400,00 €, dont le siège est à PARIS (75008), 30 RUE CAMBACERES, identifiée au SIREN sous le numéro 812884948 et immatriculée au Registre du Commerce et des Sociétés de PARIS.

### QUOTITES ACQUISES

La société BW GROUPE acquiert la pleine propriété.

## DECLARATIONS DES PARTIES

Le **PROMETTANT** et le **BENEFICIAIRE** déclarent :
Que leur état civil et leurs qualités indiqués en tête des présentes sont exacts.
Qu'ils ne sont pas en état de cessation de paiement, redressement ou liquidation judiciaire.

Le **BENEFICIAIRE** déclare :
Que la société qu'il représente a son siège social en France, à l'adresse indiquée en tête des présentes.

Qu'elle n'a fait l'objet d'aucune demande en nullité ni en dissolution anticipée.

Et n'être concernés :
**-** Par aucune mesure de protection.
**-** Par aucune des dispositions du Code de la consommation sur le règlement des situations de surendettement.

Le **BENEFICIAIRE** déclare ne pas être, soit à titre personnel, soit en tant qu'associé ou mandataire social, soumis à l'interdiction d'acquérir prévue par l'article 225-19 5 bis du Code pénal.

## DOCUMENTS RELATIFS A LA CAPACITE DES PARTIES

Les pièces suivantes ont été portées à la connaissance du rédacteur des présentes à l'appui des déclarations des parties :
**Concernant le PROMETTANT :**
- Passeport.

**Concernant le BENEFICIAIRE :**
- Extrait K bis.

Ces documents ne révèlent aucun empêchement des parties à la signature des présentes.

## PRESENCE - REPRESENTATION

- Monsieur Shaun MCLEAN, époux de Madame Dara Megan BEADLE, est présent à l'acte.

- La Société dénommée BW GROUPE est représentée à l'acte par Monsieur Julien WEISS, cogérant de ladite société, agissant en vertu des pouvoirs qui lui ont été conférés aux termes de la délibération de l'assemblée générale extraordianaire des associés, en date du 6 mars 2018 dont une copie du procès-verbal est demeuré annexé.

## PROMESSE DE VENTE

Le plan de l'acte est le suivant :

**OBJET DU CONTRAT**
**TERMINOLOGIE**
**DESIGNATION**
**DELAI - REALISATION - CARENCE**
**PROPRIETE - JOUISSANCE**
**PRIX - CONDITIONS FINANCIERES**
**CONDITIONS SUSPENSIVES**
**CONDITIONS ET DECLARATIONS GENERALES**
**REGLEMENTATIONS PARTICULIERES**
**CONDITIONS RELATIVES A LA COPROPRIETE**
**FISCALITE**
**SUBSTITUTION**
**DISPOSITIONS TRANSITOIRES**

**AFFIRMATION SINCERITE - DOMICILE**

## OBJET DU CONTRAT
## PROMESSE UNILATERALE DE VENTE

Le **PROMETTANT** confère au **BENEFICIAIRE** la faculté d'acquérir, les **BIENS** ci-dessous identifiés.

Le **PROMETTANT** prend cet engagement pour lui-même ou ses ayants droit même protégés.

Le **BENEFICIAIRE** accepte la présente promesse de vente en tant que promesse, mais se réserve la faculté d'en demander ou non la réalisation.

## TERMINOLOGIE

Pour la compréhension de certains termes aux présentes, il est préalablement expliqué ce qui suit :

- Le **"PROMETTANT"** et le **"BENEFICIAIRE"** désigneront respectivement le ou les promettants et le ou les bénéficiaires, qui, en cas de pluralité, contracteront les obligations respectivement mises à leur charge solidairement entre eux, sans que cette solidarité soit rappelée chaque fois,

- Les **"BIENS"** désigneront les biens et droits immobiliers objet de la présente promesse de vente, l'**"ENSEMBLE IMMOBILIER"** désignera l'immeuble dans lequel se trouvent les **"BIENS"**.

- Les **"MEUBLES"** désigneront les meubles et objets mobiliers, s'il en existe.

## IDENTIFICATION DU BIEN

### DESIGNATION

Dans un ensemble immobilier situé à PARIS 8ÈME ARRONDISSEMENT 75008 20 Rue de Miromesnil.

Figurant ainsi au cadastre :

| Section | N° | Lieudit | Surface |
|---------|-----|--------------------|------------------|
| BM | 6 | 20 rue de Miromesnil | 00 ha 02 a 84 ca |

### Le(s) lot(s) de copropriété suivant(s) :

**Lot numéro six  (6)**

Au 4ème étage, un APPARTEMENT, comprenant : salle à manger, salon, trois chambres, hall, dégagement, cuisine, débarras, cabinet de toilette et water-closets

Au sous-sol deux CAVES portant les numéros 2 et 3.

Et les cent cinquante /mille huitièmes (150 /1008 èmes) des parties communes générales.

**Etant ici précisé que par suite de travaux réalisés par un précédent propriétaire la désignation du bien est désormais la suivante :**

Au 4ème étage, un APPARTEMENT, comprenant : séjour, trois chambres, entrée, dégagement, cuisine, débarras, deux salles de bains avec water-closets

Au sous-sol deux CAVES portant les numéros 2 et 3.

Le **PROMETTANT** déclare :

- avoir réalisé de simples travaux d'aménagement au cours de l'année 2003,

- que personnellement il n'a réalisé aucun travaux ou aménagement portant atteinte au gros oeuvre et notamment aux murs porteurs, créant des ouvertures ou comprenant des surface résultant de l'appropriation de parties communes ; travaux qui auraient nécessité l'accord d'une assemblée générale de copropriétaires, une autorisation de travaux ou l'obtention d'un permis de construire, et la souscription

d'une police « assurance-construction », conformément aux dispositions de la Loi numéro 78.12 du 4 janvier 1978 aucune constructions ou rénovation n'ayant été effectuée depuis moins de 10 ans.

     - qu'il résulte du plan annexé au reglement de copropriété que l'ouverture entre le séjour est la chambre a été fermée et qu'une nouvelle ouverture a été créée par un précédent propriétaire.

     - Qu'il a installé un WC supplémentaire dans l'une des salles de bains, avec l'accord du syndic de copropriété, au cours de l'année 2003,

     - qu'à sa connaissance les WC sont régulièrement connectés aux réseaux collectifs de l'immeuble (réseau d'eaux vannes)

     - qu'à sa connaissance les salles de bains sont régulièrement raccordées aux réseaux collectifs de l'immeuble.

     - qu'il n'existe pas à ce jour de litige avec l'un quelconque des copropriétaires, ou la copropriété en vertu de ces travaux ou aménagement,

     - que les lots objet des présentes ne sont pas à ce jour l'objet ou la cause d'un sinistre,

     - qu'il n'a jamais reçu aucune notification ou demande de régularisation à ce sujet.

     Tel que le **BIEN** existe, avec tous droits y attachés, sans aucune exception ni réserve.

<u>**PLANS DES LOTS**</u>

     Une copie des plans des lots est annexée.

### <u>Superficie de la partie privative</u>

     La superficie de la partie privative des lots de copropriété, dans la mesure où ils sont soumis aux dispositions de l'article 46 de la loi du 10 juillet 1965, est, ainsi qu'il résulte d'une attestation annexée établie par la société GRAPHITE EXPERTISE le 28 mars 2018, de :

     - 127,38 M² pour le lot numéro SIX  (6)

### <u>ETAT DESCRIPTIF DE DIVISION – REGLEMENT DE COPROPRIETE</u>

     L'ensemble immobilier sus désigné a fait l'objet d'un état descriptif de division et règlement de copropriété établi aux termes d'un acte reçu par Maître Henri PINEAU notaire à PARIS le 20 février 1953        publié au service de la publicité foncière de PARIS 1 le 7 avril 1953, volume 2100, numéro 13.

     L'état descriptif de division - règlement de copropriété a été modifié :
- aux termes d'un acte reçu par Maître GROSSE, notaire à PARIS le 17 mai 1999        , publié au service de la publicité foncière de PARIS 1 le 31 mai 1999, volume 1999P, numéro 3065.

     - aux termes d'un acte reçu par Maître TETARD, notaire à PARIS le 18 février 2013        , publié au service de la publicité foncière de PARIS 1 le 7 mars 2013, volume 2013P, numéro 848.

     Le règlement de copropriété n'ayant pas été mis en harmonie avec la loi du 10 juillet 1965, ni avec les lois du 31 décembre 1985, du 13 décembre 2000, et la loi numéro 2014-366 du 24 mars 2014 ses dispositions le cas échéant contraires à ces lois sont réputées non écrites.

## IDENTIFICATION DES MEUBLES

Les parties déclarent que la promesse ne comprend ni meubles ni objets mobiliers.

## USAGE DU BIEN

Le **PROMETTANT** déclare que le **BIEN** est actuellement à usage d'habitation.
Le **BENEFICIAIRE** entend conserver cet usage.

## EFFET RELATIF

Acquisition suivant acte reçu par Maître WATIN-AUGOUARD notaire à PARIS le 16 décembre 2002      , publié au service de la publicité foncière de PARIS 1 le 7 février 2003, volume 2003P, numéro 562.

## DELAI

La promesse de vente est consentie pour **une durée expirant le 31 mai 2018, à seize heures.**
Toutefois, et par dérogation aux dispositions de l'article 1117 du Code civil, si, à cette date, la totalité des divers documents nécessaires à la régularisation de l'acte n'étaient pas encore portés à la connaissance du notaire chargé de sa rédaction, le délai de réalisation serait automatiquement prorogé aux huit jours calendaires qui suivront la date à laquelle le notaire recevra la dernière des pièces indispensables, sans que cette prorogation puisse excéder trente jours.
En cas de carence du **PROMETTANT** pour la réalisation de la vente, ce dernier ne saurait se prévaloir à l'encontre du **BENEFICIAIRE** de l'expiration du délai ci-dessus fixé.

## REALISATION

La réalisation de la promesse aura lieu :
- Par la signature de l'acte authentique constatant le caractère définitif de la vente, accompagnée du versement par virement sur le compte du notaire chargé de recevoir l'acte authentique de vente d'une somme correspondant :
    - au prix stipulé payable comptant déduction faite de l'indemnité d'immobilisation éventuellement versée en exécution des présentes,
    - à la provision sur frais d'acte de vente et de prêt éventuel,
    - et de manière générale de tous comptes et proratas.

L'attention du **BENEFICIAIRE** est particulièrement attirée sur les points suivants :
- l'obligation de paiement par virement et non par chèque même s'il est de banque résulte des dispositions de l'article L 112-6-1 du Code monétaire et financier ;
- il lui sera imposé de fournir une attestation émanant de la banque qui aura émis le virement et justifiant de l'origine des fonds sauf si ces fonds résultent d'un ou plusieurs prêts constatés dans l'acte authentique de vente ou dans un acte authentique séparé.

## REDACTEUR DE L'ACTE AUTHENTIQUE DE VENTE

L'acte authentique constatant la réalisation de la vente sera reçu par Maître Stéphane LEVI-MARTIN Notaire à PARIS 17ème arrondissement avec la participation de Maître Virginie FOUCAULT, notaire à PARIS (16ème), assistant le PROMETTANT.

En toute hypothèse, le transfert de propriété est reporté au jour de la constatation de la vente en la forme authentique et du paiement du prix tel que convenu et des frais, même si l'échange de consentement nécessaire à la formation de la convention est antérieur à la vente.

### CARENCE

Au cas où la vente ne serait pas réalisée par acte authentique avec paiement des frais, le **BENEFICIAIRE** sera de plein droit déchu du bénéfice de la promesse sans qu'il soit besoin d'une mise en demeure de la part du **PROMETTANT** qui disposera alors librement du **BIEN** nonobstant toutes manifestations ultérieures de la volonté d'acquérir qu'aurait exprimées le **BENEFICIAIRE**.

Si la vente n'était pas réalisée du fait du **PROMETTANT**, le **BENEFICIAIRE**, après avoir versé au notaire rédacteur l'intégralité du prix et des frais (ou si le prix est payable au moyen de deniers d'emprunt, la somme correspondant à la partie du prix payable de ses deniers personnels et aux frais, après avoir justifié de l'octroi du prêt destiné au paiement du solde du prix), sera en droit de lui faire sommation par exploit d'huissier de se présenter chez le même notaire. Faute par le **PROMETTANT** de déférer à cette sommation, il sera dressé un procès-verbal de défaut destiné à être publié au service de la publicité foncière. La carence du **PROMETTANT** ne saurait entraîner aucun transfert de propriété de la part du **PROMETTANT** sur le bien, ce transfert ne devant résulter que d'un acte authentique de vente constatant le paiement du prix, ou d'un jugement à défaut de cette réalisation par acte authentique.

### FORCE EXECUTOIRE DE LA PROMESSE

Il est entendu entre les parties qu'en raison de l'acceptation par le **BENEFICIAIRE** de la promesse faite par le **PROMETTANT**, en tant que simple promesse, il s'est formé entre elles un contrat dans les termes de l'article 1124 du Code civil. En conséquence, et pendant toute la durée du contrat, celui-ci ne pourra être révoqué que par leur consentement mutuel.

Il en résulte notamment que :

- Le **PROMETTANT** a, pour sa part, définitivement consenti à la vente et qu'il est d'ores et déjà débiteur de l'obligation de transférer la propriété au profit du **BENEFICIAIRE** aux conditions des présentes si ce dernier lève son option. Le **PROMETTANT** ne peut, par suite, pendant toute la durée de la présente promesse conférer une autre promesse à un tiers ni aucun droit réel ni charge quelconque sur le **BIEN**, consentir aucun bail, location ou prorogation de bail. Il ne pourra non plus apporter aucune modification matérielle, si ce n'est avec le consentement du **BENEFICIAIRE**, ni détérioration au **BIEN**.

- Toute rétractation unilatérale de la volonté du **PROMETTANT** pendant le temps laissé au **BENEFICIAIRE** pour opter sera de plein droit inefficace et ne pourra produire aucun effet sans l'accord exprès de ce dernier. En outre, le **PROMETTANT** ne pourra pas se prévaloir des dispositions de l'article 1590 du Code civil en offrant de restituer le double de la somme le cas échéant versée au titre de l'indemnité d'immobilisation.

En cas de refus par le **PROMETTANT** de réaliser la vente par acte authentique, le **BENEFICIAIRE** pourra poursuivre l'exécution forcée de la vente par voie judiciaire ou demander réparation des conséquences de l'inexécution, nonobstant, dans les deux hypothèses, tous dommages-intérêts.

### PROPRIETE JOUISSANCE

Le **BENEFICIAIRE** sera propriétaire des **BIENS** objet de la promesse le jour de la constatation de la vente en la forme authentique et il en aura la jouissance à

compter du même jour par la prise de possession réelle, les **BIENS** devant être impérativement, à cette même date, libres de toute location ou occupation.

Le **PROMETTANT** déclare que les **BIENS** n'ont pas, avant ce jour, fait l'objet d'un congé pouvant donner lieu à l'exercice d'un droit de préemption.

### PRIX - CONDITIONS FINANCIERES

### PRIX

La vente, en cas de réalisation, aura lieu moyennant le prix de **UN MILLION CENT SOIXANTE-QUINZE MILLE EUROS (1 175 000,00 EUR)**, qui sera payable comptant le jour de la constatation authentique de la réalisation de la promesse.

### FRAIS

Les frais, droits et émoluments de la vente seront à la charge du **BENEFICIAIRE**.

### NEGOCIATION

Les parties déclarent que les présentes conventions ont été négociées directement entre elles, sans le concours ni la participation d'un intermédiaire. Si cette affirmation se révélait erronée, les éventuels honoraires de cet intermédiaire seraient à la charge des auteurs de la déclaration inexacte.

### INDEMNITE D'IMMOBILISATION - SÉQUESTRE

Les parties conviennent de fixer le montant de l'indemnité d'immobilisation à la somme forfaitaire de CENT DIX-SEPT MILLE CINQ CENTS EUROS (117 500,00 EUR).

Sur laquelle somme le **BENEFICIAIRE** verse au **PROMETTANT**, ainsi qu'il résulte de la comptabilité du rédacteur des présentes et du notaire participant, celle de CINQUANTE-HUIT MILLE SEPT CENT CINQUANTE EUROS (58 750,00 EUR), représentant partie de l'indemnité d'immobilisation ci-dessus fixée.

Cette somme est affectée en nantissement, par le **PROMETTANT** au profit du **BENEFICIAIRE**, qui accepte, à la sûreté de sa restitution éventuelle à ce dernier.

A cet effet, avec l'accord des parties, elle est versée entre les mains du notaire du **PROMETTANT**.

Le sort de la somme versée ce jour sera le suivant, selon les hypothèses ci-après envisagées :

- Elle s'imputera purement et simplement et à due concurrence sur le prix, en cas de réalisation de la vente promise.

- Elle sera restituée purement et simplement au **BENEFICIAIRE** dans tous les cas où la non réalisation de la vente résulterait de la défaillance de l'une quelconque des conditions suspensives énoncées aux présentes.

- Elle sera versée au **PROMETTANT**, et lui restera acquise à titre d'indemnité forfaitaire et non réductible faute par le **BENEFICIAIRE** ou ses substitués d'avoir réalisé l'acquisition dans les délais et conditions ci-dessus, toutes les conditions suspensives ayant été réalisées.

Le séquestre conservera cette somme pour la remettre soit au **PROMETTANT** soit au **BENEFICIAIRE** selon les hypothèses ci-dessus définies.

Quant au surplus de l'indemnité d'immobilisation, soit la somme de cinquante-huit mille sept cent cinquante euros (58 750,00 eur) le **BENEFICIAIRE** s'oblige à le verser au **PROMETTANT** au plus tard dans le délai de huit jours de l'expiration du

délai de réalisation de la promesse de vente, pour le cas où le **BENEFICIAIRE,** toutes les conditions suspensives ayant été réalisées, ne signerait pas l'acte de vente de son seul fait.

En cas de difficulté entre les parties sur le sort de l'indemnité d'immobilisation, il appartiendra à la plus diligente d'entre elles de se pourvoir en justice afin qu'il soit statué sur le sort de la somme détenue par le séquestre.

Le séquestre est dès à présent autorisé par les cocontractants à consigner l'indemnité d'immobilisation à la Caisse des Dépôts et Consignations en cas de difficultés.

Le séquestre sera déchargé de plein droit de sa mission par la remise des fonds dans les conditions sus-indiquées.

## RESERVES ET CONDITIONS SUSPENSIVES

Les effets des présentes sont soumis à la levée des réserves et à l'accomplissement des conditions suspensives suivantes.

### RESERVES

#### Réserve du droit de préemption

La promesse sera notifiée à tous les titulaires d'un droit de préemption institué en vertu de l'article L211-1 du Code de l'urbanisme ou de tout autre Code.

L'exercice de ce droit par son titulaire obligera le **PROMETTANT** aux mêmes charges et conditions convenues aux présentes.

Par cet exercice les présentes ne produiront pas leurs effets entre les parties et ce même en cas d'annulation de la préemption ou de renonciation ultérieure à l'exercice de ce droit de la part de son bénéficiaire.

### CONDITIONS SUSPENSIVES

La promesse est soumise à l'accomplissement de conditions suspensives telles qu'indiquées ci-après.

Conformément aux dispositions de l'article 1304-6 du Code civil, à partir de cet accomplissement les obligations contractées produisent leurs effets.

Toute condition suspensive est réputée accomplie, lorsque sa réalisation est empêchée par la partie qui y avait intérêt.

La partie en faveur de laquelle est stipulée exclusivement une condition suspensive est libre d'y renoncer. Dans ce cas, cette renonciation doit intervenir par courrier recommandé adressé au notaire qui la représente dans le délai prévu pour sa réalisation.

La non réalisation d'une seule de ces conditions entraîne la caducité des présentes, réputées alors n'avoir jamais existé.

En toutes hypothèses, jusqu'à la réitération authentique des présentes, le **PROMETTANT** conserve l'administration, les revenus et la gestion des risques portant sur le **BIEN**.

### CONDITIONS SUSPENSIVES DE DROIT COMMUN

Les présentes sont soumises à l'accomplissent des conditions suspensives de droit commun stipulées en la faveur du **BENEFICIAIRE**, qui sera seul à pouvoir s'en prévaloir.

Les titres de propriété antérieurs, les pièces d'urbanisme ou autres, ne doivent pas révéler de servitudes, de charges, ni de vices non indiqués aux présentes pouvant grever l'immeuble et en diminuer sensiblement la valeur ou le rendre impropre à la destination que le **BENEFICIAIRE** entend donner.

L'état hypothécaire ne doit pas révéler de saisies ou d'inscriptions dont la charge augmentée du coût des radiations à effectuer serait supérieure au prix disponible.

**Absence de condition suspensive d'obtention de prêt**

Le **BENEFICIAIRE** déclare ne recourir à aucun prêt pour le financement de l'acquisition.

**CONDITIONS ET DECLARATIONS GENERALES**

### GARANTIE DE POSSESSION

Le **PROMETTANT** garantira le **BENEFICIAIRE** contre le risque d'éviction conformément aux dispositions de l'article 1626 du Code civil.

A ce sujet le **PROMETTANT** déclare :

- qu'il n'existe à ce jour aucune action ou litige en cours pouvant porter atteinte au droit de propriété,

- qu'il n'y a eu aucun empiètement sur le fonds voisin,

- que le **BIEN** ne fait l'objet d'aucune injonction de travaux,

- que le **BIEN** n'a pas fait de sa part l'objet de travaux modifiant l'aspect extérieur de l'immeuble ou les parties communes qui n'auraient pas été régulièrement autorisés par l'assemblée des copropriétaires,

- qu'il n'a pas modifié la destination du **BIEN** en contravention des dispositions du règlement de copropriété,

- que le **BIEN** n'a pas été modifié de son fait par une annexion ou une utilisation irrégulière privative de parties communes,

- qu'il n'a conféré à personne d'autre que le **BENEFICIAIRE** un droit quelconque sur le **BIEN** pouvant empêcher la vente,

- subroger le **BENEFICIAIRE** dans tous ses droits et actions.

### GARANTIE DE JOUISSANCE

Le **PROMETTANT** déclare qu'il n'a pas délivré de congé à un ancien locataire lui ouvrant droit à l'exercice d'un droit de préemption.

### GARANTIE HYPOTHECAIRE

Le **PROMETTANT** s'obligera, s'il existe un ou plusieurs créanciers hypothécaires inscrits, à régler l'intégralité des sommes pouvant leur être encore dues, à rapporter à ses frais les certificats de radiation des inscriptions.

Un état hypothécaire délivré le 19 mars 2018 et certifié à la date du 16 mars 2018 ne révèle aucune inscription.

Cet état hypothécaire est annexé.

Le **PROMETTANT** déclare que la situation hypothécaire est identique à la date de ce jour et n'est susceptible d'aucun changement.

### SERVITUDES

Le **BENEFICIAIRE** profitera ou supportera les servitudes s'il en existe.

Le **PROMETTANT** déclare :

- ne pas avoir créé ou laissé créer de servitude qui ne serait pas relatée aux présentes,

- qu'à sa connaissance, il n'en existe pas d'autres que celles résultant le cas échéant de l'acte, de la situation naturelle et environnementale des lieux, de l'urbanisme, du règlement de copropriété et de ses modificatifs.

### ETAT DU BIEN

Le **BENEFICIAIRE** prendra le **BIEN** dans l'état où il se trouve à ce jour, tel qu'il l'a vu et visité, le **PROMETTANT** s'interdisant formellement d'y apporter des modifications matérielles ou juridiques.

Il déclare que la désignation du **BIEN** figurant aux présentes correspond à ce qu'il a pu constater lors de ses visites.

Il n'aura aucun recours contre le **PROMETTANT** pour quelque cause que ce soit notamment en raison :

- des vices apparents,
- des vices cachés.
- Dont le sol, le sous-sol et les ouvrages pourraient être affectés.

**Le PROMETTANT déclare :**

- **qu'il y a eu un dégât des eaux dans le salon provenant de la terrasse de l'étage supérieur constituant une partie commune.**
- **L'origine de la fuite a été réparée ainsi que cela lui a été précisé par le syndic,**
- **A ce jour le mur est en cours de séchage,**
- **Un constat de dégât des eaux a été établi**

**Le PROMETTANT subrogera le jour de la signature de l'acte authentique de vente, le BENEFICIAIRE dans tous ses droits à indemnisation, le cas échéant.**

### CONTENANCE DU TERRAIN D'ASSIETTE

Le **PROMETTANT** ne confère aucune garantie de contenance du terrain d'assiette de l'ensemble immobilier.

### IMPOTS ET TAXES

### Impôts locaux

Le **PROMETTANT** déclare être à jour des mises en recouvrement des impôts locaux.

Le **BENEFICIAIRE** sera redevable à compter du jour de la signature de l'acte authentique des impôts et contributions.

La taxe d'habitation, si elle est exigible, est due pour l'année entière par l'occupant au premier jour du mois de janvier.

La taxe foncière, ainsi que la taxe d'enlèvement des ordures ménagères si elle est due, seront réparties entre le **PROMETTANT** et le **BENEFICIAIRE** en fonction du temps pendant lequel chacun aura été propriétaire au cours de l'année de la constatation de la réalisation des présentes.

Le **BENEFICIAIRE** règlera au **PROMETTANT** le jour de la signature de l'acte authentique de vente, directement et par la comptabilité de l'Office notarial, le prorata de taxe foncière et, le cas échéant, de taxe d'enlèvement des ordures ménagères, déterminé par convention entre les parties sur le montant de la dernière imposition.

Ce règlement sera définitif entre les parties, éteignant toute créance ou dette l'une vis-à-vis de l'autre à ce sujet, quelle que soit la modification éventuelle de la taxe foncière pour l'année en cours.

## Avantage fiscal lié à un engagement de location

Le **PROMETTANT** déclare ne pas souscrire actuellement à l'un des régimes fiscaux lui permettant de bénéficier de la déduction des amortissements en échange de l'obligation de louer à certaines conditions.

## Aide personnalisée au logement

Le **PROMETTANT** déclare ne pas avoir conclu de convention avec l'Etat dans le cadre des dispositions applicables aux logements conventionnés à l'égard de l'A.P.L..

## Agence nationale de l'habitat

Le **PROMETTANT** déclare ne pas avoir conclu de convention avec l'agence nationale de l'habitat.

### CONTRATS DE DISTRIBUTION ET DE FOURNITURES

Le **BENEFICIAIRE** fera son affaire personnelle de la continuation ou de la résiliation de tous contrats de distribution et de fourniture souscrits par le **PROMETTANT**.

Les parties déclarent avoir été averties de la nécessité d'établir entre elles un relevé des compteurs faisant l'objet d'un comptage individuel.

Le **PROMETTANT** déclare être à jour des factures mises en recouvrement liées à ses contrats de distribution et de fournitures. Il procèdera si nécessaire à la régularisation de ses abonnements de sorte que celle-ci n'entrave pas la souscription de nouveaux abonnements par le **BENEFICIAIRE**, que ce soit auprès du même prestataire ou d'un autre.

### ASSURANCE

Le **BENEFICIAIRE** souscrira une assurance à compter du jour de la signature de l'acte de vente, il ne continuera pas les polices d'assurance actuelles garantissant le **BIEN** et conférera à cet effet mandat au **PROMETTANT**, qui accepte, de résilier les contrats lorsqu'il avertira son assureur de la signature de l'acte authentique.

L'ensemble immobilier dans lequel se trouve le **BIEN** étant assuré par une police souscrite par le syndicat des copropriétaires, le **BENEFICIAIRE** devra se conformer à toutes les décisions du syndicat la concernant.

### CONTRAT D'AFFICHAGE

Le **PROMETTANT** déclare qu'il n'a pas été conclu de contrat d'affichage.

## CHARGES ET CONDITIONS RESULTANT DE L'APPLICATION DE REGLEMENTATIONS PARTICULIERES

## DISPOSITIONS RELATIVES A L'URBANISME

### URBANISME

Les documents d'urbanisme suivants sont annexés :
- Une note de renseignements d'urbanisme en date du 5 avril 2018,
- Un plan de situations.

Le **BENEFICIAIRE** reconnaît avoir reçu du notaire soussigné toutes explications et éclaircissements sur la portée, l'étendue et les effets de ces charges, prescriptions et limitations.

Il s'oblige en conséquence à faire son affaire personnelle de l'exécution des charges et prescriptions, du respect des servitudes publiques et autres limitations administratives au droit de propriété mentionnées sur ces documents.

## DISPOSITIONS SUR LE CHANGEMENT D'USAGE OU DE DESTINATION

### CHANGEMENT D'USAGE - INFORMATION

Dans la mesure où le **BENEFICIAIRE** entendrait affecter directement ou indirectement tout ou partie du **BIEN** actuellement à usage d'habitation (en tout ou partie) à un autre usage, le notaire soussigné l'avertit du contenu impératif des dispositions de l'article L631-7 du Code de la construction et de l'habitation relatif au changement d'usage, aux inconvénients pouvant résulter à son encontre de l'inobservation de ce texte, ainsi que du respect des normes dont relève l'usage envisagé.

Le domaine d'applicabilité de l'article L631-7 est le suivant :

* les villes de plus de 200 000 habitants,

* les villes situées en petite couronne : Hauts-de-Seine (92), Seine-Saint-Denis (93) ou Val-de-Marne (94),

* les communes ayant rendu applicable l'article L 631-7 conformément aux dispositions de l'article L 631-9 du Code de la construction et de l'habitation.

L'obtention de l'autorisation du Maire, ou celle du Maire d'arrondissement, est nécessaire avant de procéder au changement d'usage du logement. Aucune stipulation contractuelle du bail ou du règlement de copropriété, s'ils existent, ne doivent s'opposer à ce changement d'usage.

L'autorisation de changement d'usage est accordée à titre personnel.

Elle cesse de produire effet lorsqu'il est mis fin, à titre définitif et pour quelque raison que ce soit, au nouvel usage. Dès le départ du bénéficiaire de cet usage, les lieux ayant fait l'objet de l'autorisation doivent être rendus à l'habitation, sauf si l'autorisation de changement d'usage a été accordée par compensation c'est-à-dire par l'affectation à l'habitation d'un local équivalent, l'autorisation se trouvant alors attachée au local.

Lorsque le changement d'usage fait l'objet de travaux entrant dans le champ du permis de construire, la demande de permis de construire ou la déclaration préalable vaut demande de changement d'usage, ce changement est ainsi attaché au BIEN.

### Changement de destination - Information

La destination caractérise ce pourquoi l'immeuble a été construit ou transformé. L'article R 151-27 du Code de l'urbanisme énonce cinq destinations possibles, savoir : l'exploitation agricole et forestière, l'habitation, le commerce et les activités de service, les équipements d'intérêt collectif et services publics, et enfin les autres activités des secteurs secondaire ou tertiaire. L'article R 151-28 du même Code subdivise ces cinq destinations en vingt sous destinations fixées par un arrêté du 10 novembre 2016.

En cas de changement de destination entre les destinations et sous destinations sus visées, il y a lieu à déclaration préalable, toutefois, si ce changement s'accompagne de travaux ayant pour objet la modification des structures porteuses ou de la façade du bâtiment, il y a lieu à obtention d'un permis de construire.

Il n'y a pas de prescription applicable à l'usage irrégulier d'un immeuble, cet usage irrégulier pouvant constituer une infraction pénale continue.

## DISPOSITIONS RELATIVES A LA CONSTRUCTION

### ABSENCE D'OPERATION DE CONSTRUCTION OU DE RENOVATION DEPUIS DIX ANS

Le **PROMETTANT** déclare qu'à sa connaissance :

- aucune construction ou rénovation n'a été effectuée dans les dix dernières années,

- aucun élément constitutif d'ouvrage ou équipement indissociable de l'ouvrage au sens de l'article 1792 du Code civil n'a été réalisé dans ce délai.

**- Dispense du dossier d'intervention ultérieure sur l'ouvrage**

La construction de l'**ENSEMBLE IMMOBILIER** n'a pas donné lieu à l'établissement du dossier prévu par l'article L 4532-97 du Code du travail, obligeant le maître d'ouvrage à rassembler les données de nature à faciliter la prévention des risques professionnels lors d'interventions ultérieures, le commencement des travaux de celle-ci étant antérieur au 30 décembre 1994.

## DIAGNOSTICS

### DOSSIER DE DIAGNOSTICS TECHNIQUES

Pour l'information des parties a été dressé ci-après le tableau du dossier de diagnostics techniques tel que prévu par les articles L 271-4 à L 271-6 du Code de la construction et de l'habitation, qui regroupe les différents diagnostics techniques immobiliers obligatoires en cas de vente selon le type d'immeuble en cause, selon sa destination ou sa nature, bâti ou non bâti.

| Objet | Bien concerné | Elément à contrôler | Validité |
|---|---|---|---|
| Plomb | Si immeuble d'habitation (permis de construire antérieur au 1er janvier 1949) | Peintures | Illimitée ou un an si constat positif |
| Amiante | Si immeuble (permis de construire antérieur au 1er juillet 1997) | Parois verticales intérieures, enduits, planchers, plafonds, faux-plafonds, conduits, canalisations, toiture, bardage, façade en plaques ou ardoises | Illimitée sauf si présence d'amiante détectée nouveau contrôle dans les 3 ans |
| Termites | Si immeuble situé dans une zone délimitée par le préfet | Immeuble bâti ou non mais constructible | 6 mois |
| Gaz | Si immeuble d'habitation ayant une installation de plus de 15 ans | Etat des appareils fixes et des tuyauteries | 3 ans |
| Risques | Si immeuble situé dans une zone couverte par un plan de prévention des risques | Immeuble bâti ou non | 6 mois |
| Performance énergétique | Si immeuble équipé d'une installation de chauffage | Consommation et émission de gaz à effet de serre | 10 ans |
| Electricité | Si immeuble d'habitation ayant une installation de plus de 15 ans | Installation intérieure : de l'appareil de commande aux bornes d'alimentation | 3 ans |
| Assainissement | Si immeuble d'habitation non raccordé au réseau | Contrôle de l'installation existante | 3 ans |

| | public de collecte des eaux usées | | |
|---|---|---|---|
| Mérules | Si immeuble d'habitation dans une zone prévue par l'article L 133-8 du Code de la construction et de l'habitation | Immeuble bâti | 6 mois |

Il est fait observer :
- que les diagnostics "plomb" "gaz" et "électricité" ne sont requis que pour les immeubles ou parties d'immeubles à usage d'habitation ;
- que le propriétaire des lieux, ou l'occupant s'il ne s'agit pas de la même personne, doit permettre au diagnostiqueur d'accéder à tous les endroits nécessaires au bon accomplissement de sa mission, à défaut le propriétaire des lieux pourra être considéré comme responsable des conséquences dommageables dues au non respect de cette obligation ;
- qu'en l'absence de l'un de ces diagnostics en cours de validité au jour de la signature de l'acte authentique de vente, et dans la mesure où ils sont exigés par leurs réglementations particulières, le vendeur ne pourra s'exonérer de la garantie des vices cachés correspondante.

Conformément aux dispositions de l'article L 271-6 du Code de la construction et de l'habitation, le dossier de diagnostic technique a été établi par la société GRAPHITE ESPERTISE située à PARIS (75116), 94 Boulevard Flandrin, diagnostiqueur immobilier certifié par un organisme spécialisé accrédité dans les domaines relatés aux présentes. A cet effet, le diagnostiqueur a remis préalablement au propriétaire (ou à son mandataire) une attestation sur l'honneur dont une copie est annexée indiquant les références de sa certification et l'identité de l'organisme certificateur, et aux termes de laquelle il certifie être en situation régulière au regard des prescriptions légales et disposer des moyens nécessaires, tant matériel qu'humain, à l'effet d'établir des états, des constats et des diagnostics.

### DIAGNOSTICS TECHNIQUES

### Plomb

L'**ENSEMBLE IMMOBILIER** ayant été construit avant le 1er janvier 1949, et étant affecté, en tout ou partie, à un usage d'habitation, entre dans le champ d'application des dispositions de l'article L 1334-5 du Code de la santé publique pour lequel un constat de risque d'exposition au plomb doit être établi.

Le but de ce diagnostic est de mesurer à l'aide d'un appareil spécialisé le degré de concentration de plomb dans un revêtement exprimé en mg/cm2, et le risque d'exposition en fonction de la dégradation du revêtement.
Ces mesures sont réalisées par unité de diagnostic : une unité de diagnostic est définie comme étant un élément de construction, ou un ensemble d'éléments de construction, présentant a priori un recouvrement homogène.
Chaque mesure précise la concentration en plomb dont le seuil réglementaire maximal est fixé à 1mg/cm2, si la mesure est supérieure ou égale à ce seuil alors le diagnostic est positif.
Ces éléments permettent de classifier les différentes unités de diagnostic en catégories qui pour certaines entraînent des obligations réglementaires auxquelles le propriétaire du bien doit se soumettre.

| Concentration de plomb | Etat de conservation | Catégorie | Avertissement réglementaire |
|---|---|---|---|
| Mesure de plomb inférieure au seuil | | 0 | |
| Mesure de plomb | Non Visible ou Non | 1 | Veiller à l'entretien des |

| supérieure ou égale au seuil | Dégradé | | revêtements les recouvrant pour éviter leur dégradation future |
|---|---|---|---|
| Mesure de plomb supérieure ou égale au seuil | Etat d'usage | 2 | Veiller à l'entretien des revêtements les recouvrant pour éviter leur dégradation future |
| Mesure de plomb supérieure ou égale au seuil | Etat Dégradé (risque pour la santé des occupants) | 3 | Obligation d'effectuer des travaux pour supprimer l'exposition au plomb et obligation de transmettre une copie complète du rapport aux occupants et aux personnes effectuant des travaux dans le bien. |

Il est précisé que les eaux destinées à la consommation humaine doivent être conformes à des références de qualité et ne pas excéder le seuil de 10 microgrammes de plomb par litre d'eau potable, et ce conformément aux dispositions des articles R.1321-2 et R.1321-3 du Code de la santé publique.

L'arrêté du 19 août 2011 identifiant la mission du diagnostiqueur exclut du constat de risque d'exposition au plomb la recherche de plomb dans les canalisations.

**Pour les parties privatives**

Un constat de risque d'exposition au plomb effectué par la société GRAPHITE EXPERTISE, ci-dessus visée le 28 mars 2018 est annexé.

Les conclusions sont les suivantes :

*« 6.1 Classement des unités de diagnostic*
*Les mesures de concentration en plomb sont regroupées dans le tableau de synthèse suivant :*

| | Total | Non mesurées | Classe 0 | Classe 1 | Classe 2 | Classe 3 |
|---|---|---|---|---|---|---|
| Nombre d'unités de diagnostic | 121 | 18 | 79 | 20 | 4 | 0 |
| % | 100 | 15 % | 65 % | 17 % | 3 % | 0 % |

*6.2 Recommandations au propriétaire*
*…*
*Lors de la présente mission il a été mis en évidence la présence de revêtements contenant du plomb au-delà des seuils en vigueur.*

*Du fait de la présence de revêtements contenant du plomb au-delà des seuils en vigueur et de la nature des dégradations constatées (non dégradé, non visible, état d'usage) sur certaines unités de diagnostic, le propriétaire doit veiller à l'entretien des revêtements recouvrant les unités de diagnostic de classe 1 et 2, afin d'éviter leur dégradation future.».*

**Pour les parties communes**

Les renseignements pris auprès du syndic de la copropriété précisent qu'une recherche de la présence de plomb dans les parties communes a été effectuée par la société DEP le 16 octobre 2008, à l'initiative du syndicat des copropriétaires.

Les conclusions sont les suivantes : Présence de revêtements contenant du plomb en concentration supérieure ou égale à 1mg/cm² avec dégradation.

16

**Le BENEFICIAIRE déclare en avoir parfaite connaissance et vouloir en faire son affaire personnelle sans recours contre le PROMETTANT.**

### Amiante

L'article L 1334-13 premier alinéa du Code de la santé publique commande au **PROMETTANT** de faire établir un état constatant la présence ou l'absence de matériaux ou produits de la construction contenant de l'amiante.

Cet état s'impose à tous les bâtiments dont le permis de construire a été délivré avant le 1er juillet 1997.

Il a pour objet de repérer l'ensemble des matériaux et produits des listes A et B de l'annexe 13-9 du Code de la santé publique, pour ensuite identifier et localiser par zones de similitude d'ouvrage ceux contenant de l'amiante et ceux n'en contenant pas.

Les matériaux et produits de la liste A sont ceux dits matériaux friables (flocages, calorifugeages et faux-plafonds), ceux de la liste B sont dits matériaux non friables y compris les produits situés en extérieur (les matériaux de couverture, les bardages, les conduits de fumée…).

Il est rappelé qu'aux termes des dispositions législatives et réglementaires en la matière, dès lors que le rapport révèle que des matériaux et produits des listes A ou B contiennent de l'amiante, le propriétaire devra, en fonction des recommandations contenues dans le rapport :

- soit faire contrôler ou évaluer périodiquement l'état de conservation des matériaux et produits identifiés,

- soit faire surveiller le niveau d'empoussièrement dans l'atmosphère par un organisme agréé en microscopie électronique à transmission,

- soit faire procéder à des travaux de confinement, de protection, de remplacement ou de retrait.

Le tout par une entreprise spécialisée à cet effet.

**Pour les parties privatives**

Un état établi par la société GRAPHITE EXPERTISE, ci-dessus visée le 28 mars 2018, accompagné de l'attestation de compétence, est annexé.

Cet état ne révèle pas la présence d'amiante dans les matériaux et produits des listes A ou B définis à l'annexe 13-9 du Code de la santé publique.

**Pour les parties communes**

Un diagnostic technique établi par DEP le 31 octobre 2005 est annexé.
Les conclusions sont les suivantes :
Présence d'amiante dans les flocages, calorifugeages, faux-plafonds repérés :
NON
Présence d'amiante dans les matériaux de l'annexe 13-9 du code de la santé publique repérés (hors flocages, calorifugeages, faux-plafonds) : NON

Ce diagnostic porte sur les points visés par le décret n° 2002-839 du 3 mai 2002.

Le rédacteur des présentes précise que le syndicat des copropriétaires doit être mis en demeure par le propriétaire de mettre à jour rapidement le diagnostic amiante par rapport aux nouvelles modalités issues des arrêtés de décembre 2012 et juin 2013.

Le diagnostic fourni n'est pas à jour de la réglementation issue du décret n°2011-629 du 3 juin 2011, par suite le rédacteur des présentes avertit les parties que le syndicat des copropriétaires ne peut à ce sujet s'exonérer de la garantie des vices cachés en ce qui concerne les parties communes.

**Le BENEFICIAIRE déclare en avoir parfaite connaissance et vouloir en faire son affaire personnelle sans recours contre le PROMETTANT.**

### Termites

L'immeuble se trouve dans une zone délimitée par arrêté préfectoral comme étant contaminée par les termites ou susceptible de l'être.

#### Pour les parties privatives

Un état relatif à la présence de termites délivré par la société GRAPHITE EXPERTISE, ci-dessus visée le 28 mars 2018 est annexé.

Les conclusions sont les suivantes : Absence d'indices d'infestation de termites.

#### Pour les parties communes

Les renseignements pris auprès du syndic de la copropriété précisent qu'une recherche de termites dans les parties communes a été effectuée par la société EBA le 9 novembre 2012, à l'initiative du syndicat des copropriétaires.

Les conclusions sont les suivantes : Il n'a pas été repéré d'indice d'infestation de termites.

### Mérules

Les parties ont été informées des dégâts pouvant être occasionnés par la présence de mérules dans un bâtiment, la mérule étant un champignon qui se développe dans l'obscurité, en espace non ventilé et en présence de bois humide.

Le **BIEN** ne se trouve pas actuellement dans une zone de présence d'un risque de mérule délimitée par un arrêté préfectoral.

Le **PROMETTANT** déclare ne pas avoir constaté l'existence de zones de condensation interne, de traces d'humidité, de moisissures, ou encore de présence d'effritements ou de déformation dans le bois ou de tache de couleur marron ou l'existence de filaments blancs à l'aspect cotonneux, tous des éléments parmi les plus révélateurs de la potentialité de la présence de ce champignon.

### Contrôle de l'installation de gaz

Conformément aux dispositions de l'article L 134-6 du Code de la construction et de l'habitation, la vente d'un bien immobilier à usage d'habitation comportant une installation intérieure de gaz réalisée depuis plus de quinze ans doit être précédée d'un diagnostic de celle-ci.

Le **PROMETTANT** déclare que le **BIEN** possède une installation intérieure de gaz de plus de quinze ans et en conséquence avoir fait établir un diagnostic par la société GRAPHITE EXPERTISE, ci-dessus visée répondant aux critères de l'article L 271-6 du Code de la construction et de l'habitation, le 28 mars 2018 annexé.

Les conclusions sont les suivantes : L'installation ne comporte aucune anomalie.

### Contrôle de l'installation intérieure d'électricité

Conformément aux dispositions de l'article L 134-7 du Code de la construction et de l'habitation, la vente d'un bien immobilier à usage d'habitation comportant une installation intérieure d'électricité réalisée depuis plus de quinze ans doit être précédée d'un diagnostic de celle-ci.

Le **BIEN** dispose d'une installation intérieure électrique de plus de quinze ans.

Le **PROMETTANT** a fait établir un état de celle-ci par la société GRAPHITE EXPERTISE, ci-dessus visée répondant aux critères de l'article L 271-6 du Code de la construction et de l'habitation, le 28 mars 2018, annexé.
Les conclusions sont les suivantes :

L'installation intérieure d'électricité **comporte une ou des anomalies**. Il est recommandé au propriétaire de les supprimer en consultant dans les meilleurs délais un installateur électricien qualifié afin d'éliminer les dangers qu'elle(s) présente(nt). L'installation ne fait pas l'objet de constatations diverses.

Les domaines faisant l'objet d'anomalies sont :
- La protection différentielle à l'origine de l'installation électrique et sa sensibilité appropriée aux conditions de mise à la terre.
- La protection contre les surintensités adaptée à la section des conducteurs, sur chaque circuit.

**Le BENEFICIAIRE déclare en avoir parfaite connaissance et vouloir en faire son affaire personnelle sans recours contre le PROMETTANT.**

Il est rappelé au **BENEFICIAIRE** qu'en cas d'accidents électriques consécutifs aux anomalies pouvant être révélées par l'état annexé, sa responsabilité pourrait être engagée tant civilement que pénalement, de la même façon que la compagnie d'assurances pourrait invoquer le défaut d'aléa afin de refuser de garantir le sinistre électrique. D'une manière générale, le propriétaire au jour du sinistre est seul responsable de l'état du système électrique.

### Diagnostic de performance énergétique

Conformément aux dispositions des articles L 134-1 et suivants du Code de la construction et de l'habitation, un diagnostic de performance énergétique doit être établi.
Ce diagnostic doit notamment permettre d'évaluer :
- Les caractéristiques du logement ainsi que le descriptif des équipements.

- Le bon état des systèmes de chauffage fixes et de ventilation.

- La valeur isolante du bien immobilier.

- La consommation d'énergie et l'émission de gaz à effet de serre.

L'étiquette mentionnée dans le rapport d'expertise n'est autre que le rapport de la quantité d'énergie primaire consommée du bien à vendre ou à louer sur la surface totale du logement. Il existe 7 classes d'énergie (A, B, C, D, E, F, G), de "A" (BIEN économe) à "G" (BIEN énergivore).

Un diagnostic établi à titre informatif par la société GRAPHITE EXPERTISE, ci-dessus visée le 28 mars 2018, est annexé.
Les conclusions sont les suivantes :
- Consommation énergétique : 119 kWhep/m².an

- Emissions de gaz à effet de serre : 28 kg éqCO2/m².an

- Numéro d'enregistrement ADEME : 1875V2005324V

Il est précisé que le **BENEFICIAIRE** ne peut se prévaloir à l'encontre du **PROMETTANT** des informations contenues dans ce diagnostic.

Le diagnostiqueur a fourni au rédacteur des présentes une copie de la certification "DPE sans mention" qu'il a obtenue, annexée, cette certification permettant d'établir un dossier de performance énergétique sur les seuls biens à usage d'habitation principale.

### DISPOSITIFS PARTICULIERS

### Détecteur de fumée

L'article R 129-12 du Code de la construction et de l'habitation prescrit d'équiper chaque logement, qu'il se situe dans une habitation individuelle ou dans une habitation collective, d'au moins un détecteur de fumée normalisé.

L'article R 129-13 du même Code précise que la responsabilité de l'installation du détecteur de fumée normalisé mentionné à l'article R. 129-12 incombe au propriétaire et la responsabilité de son entretien incombe à l'occupant du logement.

Le détecteur de fumée doit être muni du marquage CE et être conforme à la norme européenne harmonisée NF EN 14604.

Le **BENEFICIAIRE** a constaté que le logement est équipé d'un dispositif de détection de fumée.

### Broyeur

Il n'existe pas de water-closet de type broyeur/sanibroyeur.

### DIAGNOSTICS ENVIRONNEMENTAUX

### Assainissement

Le **PROMETTANT** déclare que l'immeuble est raccordé à un réseau d'assainissement collectif des eaux usées domestiques conformément aux dispositions de l'article L 1331-1 du Code de la santé publique.

Aux termes des dispositions des articles L 1331-4 et L 1331-6 de ce Code, les parties sont informées que l'entretien et le bon fonctionnement des ouvrages permettant d'amener les eaux usées domestiques de l'immeuble à la partie publique sont soumis au contrôle de la commune, qui peut procéder, sous astreinte et aux frais du propriétaire, aux travaux indispensable à ces effets.

Ces travaux sont à la charge du propriétaire de l'immeuble. Le service public compétent en matière d'assainissement collectif peut astreindre le propriétaire au versement d'une participation pour le financement de cet assainissement collectif (L 1331-7 du Code de la santé publique). Ce paiement a pour but de tenir compte de l'économie réalisée par eux en évitant une installation d'évacuation ou d'épuration individuelle réglementaire ou la mise aux normes d'une telle installation.

Il est ici précisé que tout déversement d'eaux usées autres que domestiques dans le réseau collectif nécessite préalablement une autorisation de la mairie ou du service compétent. À compter de quatre mois après la date de réception de cette demande d'autorisation, l'absence de réponse vaut refus. Toute acceptation de ce déversement peut être subordonnée à une participation à la charge de l'auteur du déversement (L 1331-10 du Code de la santé publique).

Le **PROMETTANT** précise qu'aucun contrôle n'a été effectué par le service public compétent, qu'il n'a pas non plus reçu de ce dernier aucune mise en demeure, que la conformité de l'installation aux normes actuellement en vigueur n'est pas garantie, ce que reconnaît le BENEFICIAIRE.

Le **PROMETTANT** informe le **BENEFICIAIRE**, qu'à sa connaissance, les ouvrages permettant d'amener les eaux usées domestiques de l'immeuble à la partie publique ne présentent pas d'anomalie ni aucune difficulté particulière d'utilisation.

### Etat des servitudes "risques" et d'information sur les sols

Un état des servitudes "risques" et d'information sur les sols est annexé.

**Absence de sinistres avec indemnisation**

Le **PROMETTANT** déclare qu'à sa connaissance l'immeuble n'a pas subi de sinistres ayant donné lieu au versement d'une indemnité, notamment en application de l'article L 125-2 ou de l'article L 128-2 du Code des assurances.

### INFORMATION DU BENEFICIAIRE

Le **BENEFICIAIRE** déclare ici avoir pris connaissance, préalablement à la signature, des anomalies révélées par les diagnostics techniques immobiliers obligatoires dont les rapports sont annexés et des rapports de consultations des bases de données environnementales le cas échéant.

Le **BENEFICIAIRE** déclare avoir été informé par le notaire soussigné, préalablement à la signature des présentes, notamment :

- des conséquences de ces anomalies au regard du contrat d'assurance qui sera souscrit pour la couverture de l'immeuble en question,

- de la nécessité, soit de faire effectuer par un professionnel compétent les travaux permettant de remédier à ces anomalies, soit de faire état auprès de la compagnie d'assurance qui assurera le bien, du contenu et des conclusions desdits diagnostics,

- qu'à défaut d'avoir, dans les formes et délais légaux, avisé la compagnie d'assurance préalablement à la signature du contrat d'assurance, il pourrait être fait application de l'article L.113-8 du Code des assurances ci-dessous reproduit, cet article prévoyant la nullité du contrat d'assurance en cas de sinistre.

Et qu'en conséquence, Le **BENEFICIAIRE** pourrait perdre tout droit à garantie et toute indemnité en cas de sinistre même sans lien avec les anomalies en question.

Reproduction de l'article L113-8 du Code des assurances :

*"Indépendamment des causes ordinaires de nullité, et sous réserve des dispositions de l'article L. 132-26, le contrat d'assurance est nul en cas de réticence ou de fausse déclaration intentionnelle de la part de l'assuré, quand cette réticence ou cette fausse déclaration change l'objet du risque ou en diminue l'opinion pour l'assureur, alors même que le risque omis ou dénaturé par l'assuré a été sans influence sur le sinistre.*

*Les primes payées demeurent alors acquises à l'assureur, qui a droit au paiement de toutes les primes échues à titre de dommages et intérêts.*

*Les dispositions du second alinéa du présent article ne sont pas applicables aux assurances sur la vie."*

## SITUATION ENVIRONNEMENTALE

### Protection de l'environnement :

Le notaire informe les parties des dispositions suivantes du Code de l'environnement :

- Celles de l'article L 514-20 du Code de l'environnement, et ce dans la mesure où une installation soumise à autorisation ou à enregistrement a été exploitée sur les lieux :

*«Lorsqu'une installation soumise à autorisation, ou à enregistrement, a été exploitée sur un terrain, le vendeur de ce terrain est tenu d'en informer par écrit l'acheteur ; il l'informe également, pour autant qu'il le connaisse, des dangers ou inconvénients importants qui résultent de l'exploitation.*

*Si le vendeur est l'exploitant de l'installation, il indique également par écrit à l'acheteur si son activité a entraîné la manipulation ou le stockage de substances chimiques ou radioactives. L'acte de vente atteste de l'accomplissement de cette formalité.*

*A défaut et si une pollution constatée rend le terrain impropre à sa destination précisée dans le contrat, dans un délai de deux ans à compter de la découverte de la pollution, l'acheteur a le choix de demander la résolution de la vente ou de se faire restituer une partie du prix ; il peut aussi demander la réhabilitation du site aux frais du vendeur, lorsque le coût de cette réhabilitation ne paraît pas disproportionné par rapport au prix de vente.»*

- Celles de l'article L 125-7 du Code de l'environnement, et ce dans la mesure où une installation soumise à autorisation ou à enregistrement n'a pas été exploitée sur les lieux :

*«Sans préjudice de l'article L 514-20 et de l'article L 125-5, lorsqu'un terrain situé en zone d'information sur les sols mentionné à l'article L 125-6 fait l'objet d'un contrat de vente ou de location, le vendeur ou le bailleur du terrain est tenu d'en informer par écrit l'acquéreur ou le locataire. Il communique les informations rendues publiques par l'Etat, en application du même article L. 125-6. L'acte de vente ou de location atteste de l'accomplissement de cette formalité.*

*A défaut et si une pollution constatée rend le terrain impropre à sa destination précisée dans le contrat, dans un délai de deux ans à compter de la découverte de la pollution, l'acheteur ou le locataire a le choix de demander la résolution du contrat ou, selon le cas, de se faire restituer une partie du prix de vente ou d'obtenir une réduction du loyer. L'acquéreur peut aussi demander la réhabilitation du terrain aux frais du vendeur lorsque le coût de cette réhabilitation ne paraît pas disproportionné par rapport au prix de vente.»*

En outre, pour ce qui concerne le traitement des terres qui seront excavées, elles deviennent alors des meubles et, si elles sont polluées, seront soumises à la réglementation des déchets. Elles devront, à ce titre, faire l'objet d'une évacuation dans des décharges appropriées au caractère dangereux, non dangereux ou inerte des déchets.

Le **PROMETTANT** déclare :
- ne pas avoir personnellement exploité une installation soumise à autorisation sur les lieux objet des présentes ;
- ne pas connaître l'existence de déchets considérés comme abandonnés ;

A l'appui de ses déclarations sont demeurés annexés les résultats des requêtes suivantes :

### CONSULTATION DE BASES DE DONNEES ENVIRONNEMENTALES

Les bases de données suivantes ont été consultées :

- La base de données relative aux anciens sites industriels et activités de services (BASIAS).

- La base de données relative aux sites et sols pollués ou potentiellement pollués appelant une action des pouvoirs publics, à titre préventif ou curatif (BASOL).

- La base de données relative aux risques naturels et technologiques (GEORISQUES).

- La base des installations classées soumises à autorisation ou à enregistrement du ministère de l'environnement, de l'énergie et de la mer.

Une copie de ces consultations est annexée.

## REGLEMENTATIONS SPECIFIQUES A LA COPROPRIETE

### IMMATRICULATION DU SYNDICAT DES COPROPRIETAIRES

L'article L 711-1 du Code de la construction et de l'habitation institue un registre auquel sont immatriculés les syndicats de copropriétaires définis à l'article 14

de la loi n° 65-557 du 10 juillet 1965 fixant le statut de la copropriété des immeubles bâtis, qui administrent des immeubles à destination partielle ou totale d'habitation.

Aux termes des dispositions de l'article L 711-5 du même Code :
*"Tout acte authentique de vente devant notaire relatif à un lot de copropriété comporte la mention du numéro d'immatriculation de la copropriété."*

L'obligation d'immatriculation est applicable à compter du, savoir :

- 31 décembre 2016, pour les syndicats de copropriétaires comportant plus de 200 lots ainsi que pour les syndicats de copropriétaires des immeubles neufs ou des immeubles mis en copropriété,

- 31 décembre 2017, pour les syndicats de copropriétaires comportant plus de 50 lots,

- 31 décembre 2018, pour les autres syndicats de copropriétaires.

**Le syndicat des copropriétaires n'est pas encore immatriculé.**
L'immatriculation est en cours ainsi qu'il résulte d'un mail du syndic en date du 28 mars 2018 demeuré annexé aux présentes.

La déclaration devra être effectuée conformément aux dispositions du décret numéro 2016-1167 du 26 août 2016 et de l'arrêté du 10 octobre 2016 du ministre chargé du logement et de l'habitat durable, et ce compte tenu du calendrier d'application sus-indiqué.
Lorsque le syndic n'a pas procédé à l'immatriculation du syndicat de copropriétaires, le notaire peut mettre en demeure, par lettre recommandée avec demande d'avis de réception, le syndic d'y procéder. A défaut de réponse du syndic dans le délai d'un mois, le notaire devra procéder à l'immatriculation d'office dans le mesure où l'une des dates butoirs attachées au nombre des lots et applicable en l'espèce venait à être dépassée.
Tant qu'ils ne sont pas immatriculés au registre et que les données y figurant ne sont pas actualisées, les syndicats de copropriétaires ne peuvent pas bénéficier de subventions de l'Etat, de ses établissements publics, des collectivités territoriales, de leurs groupements ou de leurs établissements publics.

### CARNET D'ENTRETIEN DE L'ENSEMBLE IMMOBILIER

Un carnet d'entretien de l'ensemble immobilier doit être tenu par le syndic.

Ce carnet d'entretien a pour objet de mentionner :

- si des travaux importants ont été réalisés,

- si des contrats d'assurance dommages souscrits par le syndicat des copropriétaires sont en cours,

- s'il existe des contrats d'entretien et de maintenance des équipements communs,

- l'échéancier du programme pluriannuel de travaux décidés par l'assemblée générale s'il en existe un.

Les parties déclarent avoir été informées par le notaire, dès avant ce jour, des dispositions de l'article 4-4 du décret du 67-223 du 17 mars 1967 :
*"Lorsque le candidat à l'acquisition d'un lot ou d'une fraction de lot le demande, le propriétaire cédant est tenu de porter à sa connaissance le carnet d'entretien de l'immeuble ainsi que le diagnostic technique."*

Le pré-état délivré par le syndic révèle l'existence du carnet d'entretien.

### DIAGNOSTIC TECHNIQUE GLOBAL

Le 1er alinéa de l'article L 731-1 du Code de la construction et de l'habitation dispose que :

*"Afin d'assurer l'information des copropriétaires sur la situation générale de l'immeuble et, le cas échéant, aux fins d'élaboration d'un plan pluriannuel de travaux, l'assemblée générale des copropriétaires se prononce sur la question de faire réaliser par un tiers, disposant de compétences précisées par décret, un diagnostic technique global pour tout immeuble à destination partielle ou totale d'habitation relevant du statut de la copropriété."*

L'article L 731-4 du Code de la construction et de l'habitation dispose que :
*"Toute mise en copropriété d'un immeuble construit depuis plus de dix ans est précédée du diagnostic technique global prévu à l'article L. 731-1."*
Ce dossier doit comporter :

- une analyse de l'état apparent des parties communes et des équipements communs de l'immeuble,

- un état de la situation du syndicat des copropriétaires au regarde des obligations légales et réglementaires au titre de la construction et de l'habitation,

- une analyse des améliorations possibles de la gestion technique et patrimoniale de l'immeuble,

- un diagnostic de performance énergétique de l'immeuble tel que prévu par les dispositions des articles L 134-3 ou L 134-4 1 du Code de la construction et de l'habitation.

L'autorité administrative compétente peut à tout moment, pour vérifier l'état de bon usage et de sécurité des parties communes d'un immeuble collectif à usage principal d'habitation soumis au statut de la copropriété présentant des désordres potentiels, demander au syndic de produire ce diagnostic. A défaut de sa production dans un délai d'un mois après notification de la demande, l'autorité administrative compétente mentionnée peut le faire réaliser d'office en lieu et place du syndicat des copropriétaires et à ses frais.

Le diagnostic technique global n'a pas été établi.
Le notaire précise que l'absence d'un tel diagnostic ne permet pas au **BENEFICIAIRE** d'apprécier valablement l'importance matérielle et financière des dépenses à prévoir dans la copropriété dans les années à venir.

### EMPRUNT COLLECTIF

Les articles 26-4 à 26-8 de la loi numéro 65-557 du 10 juillet 1965 donnent la possibilité aux syndicats de copropriétaires de souscrire un emprunt bancaire en leur nom propre en vue de financer non seulement des travaux sur les parties communes de l'immeuble, mais également des travaux d'intérêt collectif sur les parties privatives, des acquisitions de biens conformes à l'objet du syndicat, ou d'assurer le préfinancement de subventions publiques accordées pour la réalisation des travaux votés.

L'état délivré le syndic ne révèle pas l'existence d'un tel type d'emprunt.

### FONDS DE TRAVAUX

L'article 14-2 II de la loi numéro 65-557 du 10 juillet 1965 instaure la création d'un fonds de travaux pour les immeubles soumis au régime de la copropriété et à usage d'habitation en tout ou partie. Le décret numéro 2016-1914 du 27 décembre 2016 ainsi qu'un arrêté du même jour sont venus préciser ce régime de fonds de travaux.

L'immeuble entre dans le champ d'application de l'obligation de créer un fonds de travaux.

Ce fonds est alimenté par une cotisation annuelle versée selon les mêmes modalités que les provisions du budget prévisionnel. Ces sommes sont définitivement acquises au syndicat, par suite elles ne donnent pas lieu à leur remboursement par le syndicat lors de la cession de lots.

Lorsque le montant du fonds de travaux sera supérieur à celui du budget prévisionnel le syndic inscrira à l'ordre du jour de l'assemblée générale l'élaboration d'un plan pluriannuel de travaux et la suspension des cotisations en fonction des décisions prises par cette assemblée sur le plan de travaux.

Les parties conviennent d'effectuer directement entre elles de la répartition de ces sommes.

### ASCENSEUR - REGLEMENTATION

Tous les ascenseurs desservant de manière permanente tous les types de bâtiments, quelle que soit leur date d'installation, sont concernés par les obligations de mise en conformité, de contrôle technique quinquennal et d'établissement d'un contrat d'entretien et de maintenance.

L'ensemble est réglementé par les articles L125-1, L 125-2, L 125-2-1, L 125-2-2 et R 125- et suivants du Code de la Construction et de l'habitation.

Le contrôle technique a pour objet :

- de vérifier que les appareils auxquels s'applique le décret n° 2000-810 du 24 août 2000 relatif à la mise sur le marché des ascenseurs antérieurement au 27 août 2000 sont équipés des dispositifs prévus par ce décret et que ceux-ci sont en bon état ;

- de vérifier que les appareils qui n'entrent pas dans le champ d'application du décret du 24 août 2000 susmentionné, sont équipés des dispositifs de sécurité prévus par les articles R. 125-1-1 et R. 125-1-2 et que ces dispositifs sont en bon état, ou que les mesures équivalentes ou prévues à l'article R. 125-1-3 sont effectivement mises en œuvre.

- de repérer tout défaut présentant un danger pour la sécurité des personnes ou portant atteinte au bon fonctionnement de l'appareil.

Le **BENEFICIAIRE** est informé que la responsabilité de la mise en sécurité de l'ascenseur incombe au syndicat des copropriétaires.

### GARANTIE DE SUPERFICIE

Conformément aux dispositions de l'article 46 de la loi du 10 juillet 1965, le **PROMETTANT** a fourni à ses frais la superficie de la partie privative des **BIENS**.

Les parties ont été informées par le notaire, ce qu'elles reconnaissent, de la possibilité pour le **BENEFICIAIRE** d'agir en révision du prix si, pour au moins un des lots, la superficie réelle est inférieure de plus d'un vingtième à celle exprimée aux présentes. En cas de pluralité d'inexactitudes, il y aura pluralité d'actions, chaque action en révision de prix ne concernant que la propre valeur du lot concerné.

La révision du prix dont il s'agit consistera en une diminution de la valeur du lot concerné proportionnelle à la moindre mesure.

L'action en diminution, si elle est recevable, devra être intentée par le **BENEFICIAIRE** dans un délai d'un an à compter de la date de l'acte authentique constatant la réalisation des présentes, et ce à peine de déchéance.

Le **PROMETTANT** déclare que la superficie de la partie privative des **BIENS**, soumis à la loi ainsi qu'à ses textes subséquents, est de savoir :

- 127,38 M² pour le lot numéro SIX  (6)

Ainsi qu'il résulte d'une attestation annexée établie par la société GRAPHITE EXPERTISE le 28 mars 2018.

<u>STATUT DE LA COPROPRIETE</u>

**Syndic de copropriété**

Le **PROMETTANT** informe le **BENEFICIAIRE** que :

- le syndic de l'immeuble est BARATTE ET A, 13 Rue Paul Valéry     , 75016 PARIS 16ÈME ARRONDISSEMENT ;

- l'immeuble est assuré par les soins du syndic à la compagnie GENERALI suivant police numéro AP 703 139 souscrite par l'intermédiaire de Cabinet DOUSSET & Cie - JL CONSULTANT - 5 Place Tristan Bernard - BP 90817 - 75828 PARIS CEDEX 17.

**Information du BENEFICIAIRE**

Conformément aux dispositions de l'article **L. 721-2 du Code de la Construction et de l'Habitation,** les pièces suivantes sont annexées :

- Copie du procès-verbal de l'assemblée générale des copropriétaires réunie le **08 janvier 2018**

- Copie du procès-verbal de l'assemblée générale des copropriétaires réunie le **17 mai 2017**

- Copie du procès-verbal de l'assemblée générale des copropriétaires réunie le 1er **mars 2016**

- Copie du procès-verbal de l'assemblée générale des copropriétaires réunie le 13 **mai 2015**

- Les documents relatifs à la situation financière de la copropriété et du copropriétaire vendeur délivrés par le syndic aux termes d'un état en date du **3 avril 2018** précisant notamment :

  - **le montant des charges courantes** du budget prévisionnel et **des charges hors budget** prévisionnel payées par le copropriétaire vendeur au titre des deux exercices comptables précédant la vente ;

  - **les sommes pouvant rester dues par le copropriétaire vendeur** au syndicat des copropriétaires et les sommes qui seront dues au syndicat par l'acquéreur (sauf lorsque le syndicat comporte moins de dix lots et a un budget prévisionnel moyen sur une période de trois exercices consécutifs inférieur à 15 000 Euros) ;

  - **l'état global des impayés de charges** au sein du syndicat et de la dette vis-à-vis des fournisseurs (sauf lorsque le syndicat comporte moins de dix lots et a un budget prévisionnel moyen sur une période de trois exercices consécutifs inférieur à 15 000 Euros) ;

  - **le montant de la part du fonds de travaux rattachée au lot principal** vendu et le montant de la dernière cotisation au fonds versée par le copropriétaire vendeur au titre de son lot.

  - le **carnet d'entretien**

En outre le **PROMETTANT** a remis à l'instant même au **BENEFICIAIRE** qui le reconnaît, en présence du notaire soussigné, les documents suivants :

- L'état descriptif de division contenant règlement de copropriété et ses modificatifs sus-énoncés

### Respect du règlement de copropriété

Le **BENEFICIAIRE** devra respecter les stipulations du règlement de copropriété, de ses modificatifs éventuels visés ci-dessus ainsi que les dispositions des lois et décrets postérieurs régissant la copropriété. Il devra supporter les obligations qui en découlent et notamment acquitter les charges incombant au propriétaire dudit immeuble en vertu de ces documents.

### Répartition entre le PROMETTANT et le BENEFICIAIRE de la charge de paiement des créances de la copropriété

**- Principes de répartition**

Principes légaux :
Les parties sont informées des dispositions législatives et réglementaires applicables en matière de répartition entre le **PROMETTANT** et le **BENEFICIAIRE** de la charge du paiement des créances de la copropriété, savoir :

- les provisions sur charges sont, sauf dispositions contraires prises par l'assemblée générale des copropriétaires, exigibles par quart le premier jour de chaque trimestre (article 14-1 alinéas 2 et 3 de la loi numéro 65-557 du 10 juillet 1965) ;

- le transfert des charges liquides et exigibles n'est pris en compte par le syndicat des copropriétaires qu'à partir du moment où la vente a été notifiée au syndic (dispositions combinées des articles 20 de la loi du 10 juillet 1965 et 5 du décret du 17 mars 1967) ;

- le paiement de la provision exigible du budget prévisionnel incombe au **PROMETTANT** (article 14-1 alinéa 3 de la loi numéro 65-557 du 10 juillet 1965) ;

- le paiement des provisions sur les dépenses non comprises dans le budget prévisionnel incombe à celui, **PROMETTANT** ou **BENEFICIAIRE**, qui est copropriétaire au moment de l'exigibilité ;

- le trop ou le moins perçu sur provisions, révélé par l'approbation des comptes, est porté au crédit ou au débit de celui qui est copropriétaire lors de l'approbation des comptes.

Toute convention contraire aux dispositions de l'article 6-2 du décret du 17 mars 1967 n'a d'effet qu'entre les parties à la mutation à titre onéreux.

Convention des parties sur la répartition des charges, travaux et fonds de réserve

A - Charges courantes : il est convenu entre les parties que le **PROMETTANT** supportera les charges jusqu'à l'entrée en jouissance du **BENEFICIAIRE**.

B - Travaux :
Le **PROMETTANT** supportera le coût des travaux de copropriété décidés jusqu'à ce jour, que ces travaux soient exécutés ou non ou en cours d'exécution. Le **BENEFICIAIRE** supportera seul les travaux qui viendraient à être votés à compter de cette date.

Pour ce qui concerne les travaux qui viendraient, le cas échéant, à être décidés à compter de ce jour jusqu'au jour de la date de l'acte authentique de vente, ils ne seront supportés par le BENEFICIAIRE que si ce dernier a été mis en mesure d'assister à l'assemblée ayant décidé lesdits travaux.

En conséquence, en cas de réunion d'une assemblée générale des copropriétaires postérieurement aux présentes et jusqu'au jour de la date de l'acte authentique de vente, le PROMETTANT devra en informer le BENEFICIAIRE par lettre recommandée avec accusé de réception et lui communiquer l'ordre du jour de cette assemblée au moins huit jours à l'avance. Le BENEFICIAIRE pourra lors donner des instructions écrites au PROMETTANT qui devra, dans ce cas, assister à la réunion de l'assemblée des copropriétaires et émettre un vote conforme aux instructions du BENEFICIAIRE. Le PROMETTANT pourra toutefois, s'il le préfère, donner pouvoir au BENEFICIAIRE à l'effet de le représenter à cette assemblée.

En cas de non respect de ses engagements par le PROMETTANT, la charge des travaux votés à compter de ce jour jusqu'à la date de l'acte authentique de vente serait alors supportée non par le BENEFICIAIRE mais par le PROMETTANT.

C – **Travaux d'urgence** :

Il est expressément convenu que tous travaux nécessaires à la sauvegarde de **L'ENSEMBLE IMMOBILIER** décidés par le Syndic conformément à l'Article 18 de la Loi du 10 Juillet 1965 fixant le statut de la copropriété, antérieurement aux présentes ainsi qu'au jour de la réalisation authentique des présentes, exécutés ou en cours d'exécution, seront à la charge du **PROMETTANT,** qui s'oblige à leur paiement à concurrence de sa quote-part.


- Caractère définitif entre les parties des versements effectués en application de ce qui précède : compte tenu des règlements qui seront opérés par les parties le jour de la vente en application des conventions qui précèdent, le **PROMETTANT** se désistera alors en faveur du **BENEFICIAIRE** du bénéfice de toutes les sommes qui pourraient lui être allouées ou remboursées à ce titre postérieurement à la vente relativement aux biens, et corrélativement le **BENEFICIAIRE** devenu acquéreur fera son profit ou sa perte de tout trop perçu ou moins perçu pour l'exercice en cours.

Par suite, l'acquéreur renoncera en faveur du vendeur à demander à ce dernier le remboursement de toutes sommes qu'il pourrait être amené à régler ultérieurement au titre de provisions ou de dépenses comprises ou non comprises dans le budget prévisionnel et couvrant l'exercice en cours.

- **Application de ces conventions au jour de l'acte authentique de vente**

Compte tenu des dispositions des articles 6-2 et 6-3 du décret sus visé et de la convention qui vient d'être conclue quant à la répartition du coût des travaux et charges, les parties conviennent ce qui suit :

- Règlements à effectuer par le **PROMETTANT** : le **PROMETTANT** réglera au syndic par prélèvement sur le prix de la vente :

. l'ensemble des provisions exigibles, que celles-ci correspondent au budget prévisionnel ou à des dépenses non comprises dans le budget prévisionnel tels que les travaux votés antérieurement ;

. tout arriéré de provisions ou avances sur ces mêmes charges exigibles antérieurement au jour de l'acte authentique de vente ;

. les honoraires de mutation incombant au **PROMETTANT** indiqués dans l'état délivré par le syndic.

Toutefois, le **BENEFICIAIRE** remboursera le jour de la signature authentique, le prorata des charges du trimestre en cours dont le paiement a été demandé en intégralité par le syndic au **PROMETTANT**.

- Règlement à la charge du **BENEFICIAIRE** : le **BENEFICIAIRE** supportera :

les provisions de budget prévisionnel exigibles postérieurement au jour de l'entrée en jouissance ainsi que toutes provisions non comprises dans le budget prévisionnel exigibles postérieurement à cette date ;

. et plus généralement toute somme qui deviendra exigible à l'égard du syndicat des copropriétaires.

Les parties feront leur affaire personnelle du règlement des sommes dues au titre des travaux incombant au **PROMETTANT** mais réclamées par le syndic au **BENEFICIAIRE**.

- Fonds de roulement et fonds de réserve : le **PROMETTANT** déclare qu'il n'existe pas de fonds de roulement. Les provisions versées par le **PROMETTANT** et comptabilisées dans ses livres par le syndic et notamment du fonds de réserve (pour travaux, prêts, acquisitions...) tel que prévu notamment par l'article 35-4° du décret du 17 mars 1967 lui seront remboursées par le **BENEFICIAIRE** selon les modalités qui sont précisées par le syndic dans l'état daté.

Il résulte du pré état-daté délivré par le syndic que le montant de la réserve s'élève à 744,05 Euros.

Fonds de travaux Loi ALUR :
Le BENEFICIAIRE s'oblige le cas échéant à rembourser au PROMETTANT le fonds de travaux, le cas échéant versé jusqu'à la vente.

**Convention des parties sur les procédures**
Le **PROMETTANT** déclare qu'il n'existe actuellement aucune procédure en cours.

Le **BENEFICIAIRE** sera subrogé dans tous les droits et obligations du **PROMETTANT** dans les procédures concernant la copropriété, sauf si ces procédures sont le résultat d'une faute du **PROMETTANT**. En conséquence, le **PROMETTANT** se désistera en faveur du **BENEFICIAIRE**, le jour de la constatation authentique de la réalisation des présentes, du bénéfice de toutes sommes qui pourraient lui être ultérieurement allouées ou remboursées à ce titre, relativement aux **BIENS**.

**Notification de la mutation au syndic**
En application de l'article 20 de la loi numéro 65-557 du 10 juillet 1965, avis de la mutation sera donné au syndic, dès la signature de l'acte authentique de vente.

Le notaire libèrera le prix de vente disponible dès l'accord entre le syndic et le **PROMETTANT** sur les sommes restant dues. A défaut d'accord dans un délai de trois mois après l'opposition, la somme est versée au syndicat des copropriétaires sauf si l'opposition a été contestée devant les tribunaux.

**Information du Promettant**
Sur la qualité de bénéficiaire :
Le notaire chargé d'établir l'acte vente doit notifier au syndic le nom du candidat bénéficiaire ou le nom des mandataires sociaux et des associés de la société civile immobilière ou de la société en nom collectif se portant acquéreur, ainsi que le nom de leurs conjoints ou partenaires liés par un pacte civil de solidarité.

Dans un délai d'un mois, le syndic délivrera au notaire un certificat datant de moins d'un mois attestant :

- Soit que le bénéficiaire ou les mandataires sociaux et les associés de la société se portant acquéreur, leurs conjoints ou partenaires liés à eux par un pacte civil de solidarité ne sont pas copropriétaires de l'immeuble concerné par la mutation.

- Soit si l'une de ces personnes est copropriétaire de l'immeuble concerné par la mutation, qu'elle n'a pas fait l'objet d'une mise en demeure de payer du syndic restée infructueuse depuis plus de quarante-cinq jours.

Si le copropriétaire (futur bénéficiaire) n'est pas à jour de ses charges, le notaire notifiera aux parties l'impossibilité de conclure la vente, sauf pour le bénéficiaire de s'acquitter de sa dette vis-à-vis du syndicat dans les trente jours de la notification et d'en justifier.

Si aucun certificat attestant du règlement des charges n'est produit à l'issue de ce délai, le présent acte sera réputé caduc et non avenu aux torts du **BENEFICIAIRE**.

Le **BENEFICIAIRE** déclare ne pas être dans une situation rendant impossible la conclusion de la vente.

Sur la libération des fonds :

Le notaire libèrera le prix de vente disponible dès l'accord entre le syndic et le **PROMETTANT** sur les sommes restant dues. A défaut d'accord dans les trois mois de la constitution par le syndic de l'opposition régulière, il versera les sommes retenues au syndicat, sauf contestation de l'opposition devant les tribunaux par une des parties.

## FISCALITE
### REGIME FISCAL DE LA VENTE

Le **BENEFICIAIRE** déclare souscrire au régime spécial des achats effectués en vue de la revente en application des articles 1115 et 1020 du Code général des impôts.

Il déclare à cet effet :

- Etre une personne assujettie au sens de l'article 256 A du Code général des impôts.

- Qu'il s'engage à revendre le bien acquis dans le délai maximum de cinq ans de ce jour. Etant observé que ce délai est ramené à deux ans pour les reventes consistant en des ventes par lots déclenchant l'un des droits de préemption des locataires (article 10 de la loi numéro 75-1351 du 31 décembre 1975 ou article 15 de la loi numéro 89-462 du 6 juillet 1989).

- Qu'en sa qualité d'assujetti habituel, il effectue le paiement de la taxe sur la valeur ajoutée sur imprimés CA3.

- Qu'à défaut de revendre dans le délai sus-indiqué, il entend être soumis au tarif de droit commun sauf obtention d'une prorogation annuelle renouvelable telle que définie par l'article 1594-0 G IV bis du Code général des impôts.

- Enfin, qu'il ne pourra, en vertu de l'article 52 de la loi du 29 janvier 1993, céder à titre onéreux les droits qui lui sont conférés par les présentes.

## PLUS-VALUES

L'immeuble est entré dans le patrimoine du **PROMETTANT** :

Acquisition suivant acte reçu par Maître WATIN-AUGOUARD, notaire à PARIS le 16 décembre 2002 pour une valeur de six cent neuf mille sept cent quatre-vingt-seize euros et sept centimes (609 796,07 eur).

Cet acte a été publié au service de la publicité foncière de PARIS 1, le 7 février 2003  volume 2003P, numéro 562.

Le **PROMETTANT** déclare :

- avoir été averti des conséquences de sa qualité de non résident qu'il revendique sur la taxation des plus-values ;

- dépendre du centre des finances publiques des non résidents sis 10 rue du Centre à Noisy le Grand (93160).

Le dépôt du présent acte pour l'accomplissement de la formalité unique sera accompagné de la déclaration établie sur imprimé 2048-IMM-SD signé par le représentant accrédité en France en vue de la liquidation et du paiement du prélèvement sur la plus-value de cession, le montant de ce prélèvement étant soustrait du disponible du prix de vente pour être versé au trésor public.

Le représentant fiscal est la société SARF bénéficiaire de la part de la Direction Générale des Finances Publiques d'un agrément permanent de représentation fiscale.

## FACULTE DE SUBSTITUTION

Il est toutefois convenu que la réalisation des présentes par acte authentique pourra avoir lieu soit au profit du **BENEFICIAIRE** soit au profit de toute autre personne morale filiale de la société BW GROUPE que ce dernier se réserve de désigner; mais dans ce cas, il restera solidairement obligé, avec la personne désignée, au paiement du prix et à l'exécution de toutes les charges et conditions stipulées aux présentes sans exception ni réserve. Il est toutefois précisé au **BENEFICIAIRE** que cette substitution ne pourra avoir lieu qu'à titre gratuit et ne pourra pas en toute hypothèse être soumise aux dispositions des articles L 313-40 et suivants du Code de la consommation.

Les parties conviennent que la faculté de substitution ne pourra être que totale.

Pour la validité de l'exercice de la faculté de substitution le **BENEFICIAIRE** devra informer le **PROMETTANT** de l'exercice de cette substitution au moins 15 jours avant la date de réalisation des présentes en transmettant par courriel en l'étude du notaire participant, la copie des documents suivants :

- K bis de moins de 3 mois ;
- Statuts à jour.

En cas d'exercice de la substitution, les sommes avancées par le **BENEFICIAIRE** ne lui seront pas restituées, il devra faire son affaire personnelle de son remboursement par le substitué.

Le **BENEFICIAIRE** restera solidairement débiteur avec son substitué de toutes sommes que celui-ci pourra devoir au **PROMETTANT** en exécution des présentes.

Il est fait observer que la faculté de substituer un tiers ne constitue pas une cession de créance.

Les parties toutefois sont informées des conséquences suivantes inhérentes à l'exercice de cette faculté :

- Le présent avant-contrat obligera le **PROMETTANT** et la personne substituée dans tous ses termes.

## DISPOSITIONS TRANSITOIRES

### OBLIGATION DE GARDE DU PROMETTANT

Entre la date des présentes et la date d'entrée en jouissance du **BENEFICIAIRE**, les **BIENS**, et le cas échéant les **MEUBLES**, tels qu'ils sont sus-désignés demeureront sous la garde et possession du **PROMETTANT** qui s'y oblige.

En conséquence, il est convenu ce qui suit :

### Eléments d'équipement

Le **PROMETTANT** s'engage à laisser dans les **BIENS** tout ce qui est immeuble par destination ainsi que, sans que cette liste soit limitative et sous la seule réserve que les éléments ci-après désignés existent :

- les plaques de cheminées scellées, les inserts ;

- les supports de tringles à rideau, s'ils sont scellés dans le mur ;

- les trumeaux scellés, les dessus de radiateurs scellés, les moquettes ;

- les poignées de porte telles qu'elles existaient lors de la visite ;

- les pommeaux ou boules d'escalier ;

- les portes, planches et équipements de rangement des placards ;

- les arbres, arbustes, rosiers, plantes et fleurs en terre si jardin privatif ;

- l'équipement sanitaire et l'équipement de chauffage et de conditionnement d'air ;

- les éléments d'éclairage fixés au mur et/ou plafonds, à l'exception des appliques et luminaires ;

- l'équipement électrique ;

- les convecteurs électriques ;

- le câblage et les prises informatiques ;

- tous les carreaux et vitrages sans cassures ni fêlures ;

- les volets, persiennes, stores-bannes et leurs motorisations.

Le **BENEFICIAIRE** pourra visiter les lieux juste avant la prise de jouissance des **BIENS** vendus, et s'assurer du respect de l'engagement qui précède.

### Entretien, réparation

Jusqu'à l'entrée en jouissance du **BENEFICIAIRE**, le **PROMETTANT** s'engage à :

- ne pas apporter de modification quelconque ;

- délivrer les **BIENS** dans leur état actuel ;

- conserver ses assurances ;

- maintenir en bon état de fonctionnement les équipements des **BIENS** vendus : chauffe-eau, électricité, climatisation, VMC, sanitaire ;

- laisser les fils électriques d'éclairage suffisamment longs et équipés de leurs douilles et ampoules ou spots ou néons ;

- entretenir les **BIENS** vendus et leurs abords ;

- mettre hors-gel les installations en saison froide ;

- réparer les dégâts survenus depuis la visite.

Les parties se rapprocheront directement entre elles afin d'effectuer une visite préalablement à la signature de l'acte authentique de vente dans le but de vérifier l'état général par rapport à ce qu'il est à ce jour et de procéder au relevé des compteurs.

### SINISTRE PENDANT LA DUREE DE VALIDITE DES PRESENTES

En cas de sinistre de nature soit à rendre les **BIENS** inutilisables soit à porter atteinte de manière significative à leur valeur, le **BENEFICIAIRE** aurait la faculté :

- a- soit de renoncer purement et simplement à la vente et de se voir immédiatement remboursé de toutes sommes avancées par lui le cas échéant ;

b- soit de maintenir l'acquisition des **BIENS** alors sinistrés totalement ou partiellement et de se voir attribuer les indemnités susceptibles d'être versées par la ou les compagnies d'assurances concernées, sans limitation de ces indemnités fussent-elles supérieures au prix convenu aux présentes. Le **PROMETTANT** entend que dans cette hypothèse le **BENEFICIAIRE** soit purement subrogé dans tous ses droits à l'égard desdites compagnies d'assurances.

### REPRISE D'ENGAGEMENT PAR LES AYANTS DROIT DU PROMETTANT

Au cas de décès du **PROMETTANT** s'il s'agit d'une personne physique, ou de dissolution volontaire dudit **PROMETTANT** s'il s'agit d'une personne morale**,** avant la constatation authentique de la réalisation des présentes, ses ayants droit, fussent-ils protégés, seront tenus à la réalisation des présentes dans les mêmes conditions que leur auteur.

Le **BENEFICIAIRE** pourra demander, dans le délai de quinze jours du moment où il a eu connaissance du décès ou de la dissolution, à être dégagé des présentes en raison du risque d'allongement du délai de leur réalisation par suite de la survenance de cet événement. Dans cette hypothèse le montant versé à titre d'indemnité d'immobilisation sera restitué au **BENEFICIAIRE**.

En cas de pluralité de promettants personnes physiques, cette clause s'appliquera indifféremment en cas de décès d'un seul ou de tous les promettants.

### RESILIATION D'ENGAGEMENT PAR LES AYANTS DROIT DU BENEFICIAIRE

Au cas de décès du **BENEFICIAIRE** s'il s'agit d'une personne physique, ou de dissolution judiciaire dudit **BENEFICIAIRE** s'il s'agit d'une personne morale**,** avant la constatation authentique de la réalisation des présentes, les présentes seront caduques.

Pour ce qui concerne l'indemnité d'immobilisation, elle ne sera pas due et celle versée devra être restituée, et ce même si le décès ou la dissolution judiciaire survient après la réalisation des conditions suspensives.

## NOUVEAUX ETATS – CONSTATS - DIAGNOSTICS

Si, avant la réitération des présentes, de nouvelles législations protectrices du **BENEFICIAIRE** venaient à entrer en application, le **PROMETTANT** s'engage, à ses seuls frais, à fournir au **BENEFICIAIRE** les diagnostics, constats et états nécessaires le jour de la vente.

## PROVISION SUR LES FRAIS DE LA VENTE

A titre de provision sur frais, le **BENEFICIAIRE** verse au compte de l'office notarial dénommé en tête des présentes, la somme de **trois cent cinquante euros (350,00 eur).**

Sur cette provision, le **BENEFICIAIRE** autorise le Notaire soussigné à prélever un honoraire de **161.50 € HT, soit 193.80 € TTC**, au titre de la préparation et rédaction des présentes.

Si toutes les conditions suspensives sont levées et que pour une raison quelconque, l'une des parties ne voulait plus réitérer la vente, il serait dû par la partie défaillante au notaire soussigné,  la somme de SEPT CENT CINQUANTE EUROS ( 750,00 € ) par la partie défaillante au titre de la consultation, constitution et gestion du dossier, et préparation des actes  conformément à l'article L 444-1 et Annexe 4-9 4° du code de commerce ce qui est expressément accepté par les parties qui autorisent dès à présent le notaire à prélever les fonds sur les sommes qu'il pourrait détenir au titre de provisions ou de l'indemnité d'immobilisation.

### ABSENCE DE DROIT DE RETRACTATION

Le représentant de la société acquéreur déclare que, compte tenu de son objet social et du rapport direct de celui-ci avec la présente acquisition, celle-ci doit être assimilée à un professionnel de l'immobilier, par suite il reconnaît qu'elle ne peut se prévaloir des dispositions de l'article L 271-1 du Code de la construction et de l'habitation.

**REMISE DES PIECES**

Les pièces suivantes sont communiquées au **BENEFICIAIRE** pour répondre aux exigences des dispositions de l'article L 721-2 du Code de la construction et de l'habitation :

- Le règlement de copropriété et l'état descriptif de division ainsi que tous leurs modificatifs éventuels publiés.

- Les procès-verbaux des assemblées générales des trois dernières années.

- Les informations financières suivantes :
  · Le montant des charges courantes du budget prévisionnel et des charges hors budget prévisionnel payées par le vendeur sur les deux exercices précédant la vente.
  · Les sommes susceptibles d'être dues au syndicat des copropriétaires par l'acquéreur.
  · L'état global des impayés de charges au sein du syndicat et de la dette envers les fournisseurs.
  · La quote-part du fonds de travaux attachée au lot principal vendu et le montant de la dernière cotisation au fonds versée par le vendeur au titre de son lot.

- Le carnet d'entretien de l'ensemble immobilier.

Ces pièces sont annexées  à l'exception du règlement de copropriété et l'état descriptif de division ainsi que tous leurs modificatifs qui ont été transmis dès avant ce jour au BENEFICIAIRE qui le reconnaît.

Le **BENEFICIAIRE** déclare et reconnait :

- que ces pièces lui ont été communiquées préalablement par mail,

- qu'il a donné son accord exprès dans un document daté et signé de sa main et annexé,avoir pu vérifier et lister l'ensemble de ces pièces et leur concordance avec l'ensemble des pièces énumérées ci-dessus.

**PAIEMENT SUR ETAT - PUBLICITE FONCIERE - INFORMATION**

L'acte est soumis au droit d'enregistrement sur état de CENT VINGT-CINQ EUROS (125,00 EUR).
Le **BENEFICIAIRE** dispense le notaire soussigné de faire publier l'acte au service de la publicité foncière, se contentant de requérir ultérieurement à cette publication, s'il le juge utile, à ses frais. Il déclare avoir été informé par le notaire soussigné que la publication d'une promesse de vente au service de la publicité foncière a pour effet de la rendre opposable aux tiers que s'il s'agit d'une promesse de vente synallagmatique, la publication d'une promesse unilatérale n'a que pour effet d'informer les tiers de l'existence de la promesse sans pour autant rendre l'acte opposable. En conséquence, seule la publication d'une promesse synallagmatique s'oppose à la régularisation de la vente au profit d'un autre acquéreur.

Il est précisé que les présentes n'opèrent pas de transfert de propriété au sens de l'article 28 du décret numéro 55-22 du 4 janvier 1955, leur publication n'est donc pas obligatoire.
En outre, les parties entendent utiliser la possibilité qui est réservée par l'alinéa deux de l'article 1196 du Code civil pour différer le transfert de propriété à la date de la signature de l'acte authentique de vente.

## POUVOIRS

Les parties confèrent à tout clerc de l'office notarial dénommé en tête des présentes, ainsi qu'à ceux le cas échéant du notaire en participation ou en concours, avec faculté d'agir ensemble ou séparément, tous pouvoirs nécessaires à l'effet :

- de signer toutes demandes de pièces, demandes de renseignements, et lettres de purge de droit de préemption préalables à la vente ;

- de dresser et signer tous actes qui se révéleraient nécessaires en vue de l'accomplissement des formalités de publicité foncière des présentes dans l'éventualité où l'une des parties demanderait la publication du présent acte au service de la publicité foncière, d'effectuer toutes précisions pour mettre les présentes en conformité avec la réglementation sur la publicité foncière.

## ELECTION DE DOMICILE

Pour l'exécution des présentes, les parties font élection de domicile en leur demeure ou siège social respectif.

En outre, et à défaut d'accord amiable entre les parties, toutes les contestations qui pourront résulter des présentes seront soumises au Tribunal de grande instance de la situation des **BIENS**.

## COMMUNICATION DES PIECES ET DOCUMENTS

Le **BENEFICIAIRE** pourra prendre connaissance de toutes les pièces et documents ci-dessus mentionnés directement en l'office notarial dénommé en tête des présentes, sans que ce dernier ait l'obligation de les lui adresser à mesure de leur réception, sauf avis contraire écrit de sa part ou nécessité de l'informer de sujétions particulières révélées par ces pièces et documents.

## AFFIRMATION DE SINCERITE

Les parties affirment, sous les peines édictées par l'article 1837 du Code général des impôts, que le présent acte exprime l'intégralité du prix ; elles reconnaissent avoir été informées par le rédacteur des présentes des sanctions fiscales et des peines correctionnelles encourues en cas d'inexactitude de cette affirmation ainsi que des conséquences civiles édictées par l'article 1202 du Code civil.

## CONCLUSION DU CONTRAT

Les parties déclarent que les dispositions de ce contrat ont été, en respect des dispositions impératives de l'article 1104 du Code civil, négociées de bonne foi. Elles affirment que le présent contrat reflète l'équilibre voulu par chacune d'elles.

## DEVOIR D'INFORMATION DU PROMETTANT

Le **PROMETTANT** déclare avoir porté à la connaissance du **BENEFICIAIRE**, en application de l'article 1112-1 du Code civil qui impose aux parties un devoir précontractuel d'information dont seule est exclue l'information sur le prix de la vente, l'ensemble des informations dont il dispose ayant un lien direct et nécessaire avec le contenu du présent contrat, et dont l'importance pourrait être déterminante de son consentement.

Le **PROMETTANT** reconnaît être informé qu'un manquement à ce devoir serait sanctionné par sa responsabilité avec possibilité d'annulation du contrat s'il a vicié le consentement du **BENEFICIAIRE**.

**MENTION LEGALE D'INFORMATION**

L'Office notarial dispose d'un traitement informatique pour l'accomplissement des activités notariales, notamment de formalités d'actes, conformément à l'ordonnance n°45-2590 du 2 novembre 1945.

Pour la réalisation de la finalité précitée, les données sont susceptibles d'être transférées à des tiers, notamment :

- les partenaires légalement habilités,
- les Offices notariaux participant à l'acte,
- les établissements financiers concernés,
- les organismes de conseils spécialisés pour la gestion des activités notariales,
- le Conseil supérieur du notariat ou son délégataire, pour être transcrites dans une base de données immobilières, concernant les actes relatifs aux mutations d'immeubles à titre onéreux, en application du décret n° 2013-803 du 3 septembre 2013.

La communication de ces données aux tiers peut être indispensable afin de mener à bien l'accomplissement de l'acte. Toutefois, aucune donnée n'est transférée en dehors de l'Union Européenne ou de pays adéquats.

Les données sont conservées dans le respect des durées suivantes :

- 30 ans à compter de l'achèvement de la prestation pour les dossiers clients (documents permettant d'établir les actes, de réaliser les formalités)
- 75 ans pour les actes authentiques, les annexes (notamment les déclarations d'intention d'aliéner), le répertoire des actes.

Les personnes concernées peuvent accéder aux données les concernant directement auprès de l'Office notarial ou du Correspondant informatique et libertés désigné par l'Office à l'adresse suivante : cil@notaires.fr.

Le cas échéant, les personnes concernées peuvent également obtenir la rectification, l'effacement des données les concernant ou s'opposer pour motif légitime au traitement de ces données, hormis les cas où la réglementation ne permet pas l'exercice de ces droits. Toute réclamation peut être introduite auprès de la Commission Nationale de l'Informatique et des Libertés.

**CERTIFICATION D'IDENTITE**

Le notaire soussigné certifie que l'identité complète des parties dénommées dans le présent document telle qu'elle est indiquée en tête des présentes à la suite de leur nom ou dénomination lui a été régulièrement justifiée.

**FORMALISME LIE AUX ANNEXES**

Les annexes, s'il en existe, font partie intégrante de la minute.

Lorsque l'acte est établi sur support papier les pièces annexées à l'acte sont revêtues d'une mention constatant cette annexe et signée du notaire, sauf si les feuilles de l'acte et des annexes sont réunies par un procédé empêchant toute substitution ou addition.

Si l'acte est établi sur support électronique, la signature du notaire en fin d'acte vaut également pour ses annexes.

**DONT ACTE sans renvoi**

Généré en l'office notarial et visualisé sur support électronique aux lieu, jour, mois et an indiqués en entête du présent acte.

Et lecture faite, les parties ont certifié exactes les déclarations les concernant, avant d'apposer leur signature sur tablette numérique.

Puis le notaire qui a recueilli l'image de leur signature manuscrite a lui-même signé au moyen d'un procédé de signature électronique sécurisé.

36

**M. MCLEAN Shaun a signé**

à PARIS 17
le 09 avril 2018



**M. WEISS Julien représentant de la société dénommée BW GROUPE a signé**

à PARIS 17
le 09 avril 2018



**et le notaire Me LEVI FLORENCE a signé**

à PARIS 17
L'AN DEUX MILLE DIX HUIT
LE NEUF AVRIL

